**Sandra M. GOODLETT, individually and as personal representative and Administratrix of the Estate of Richard Lee Goodlett, deceased, Plaintiff–Counter–Defendant–Appellee–Cross–Appellant,**

v.

**Christopher KALISHEK, Defendant–Counter–Claimant–Appellant–Cross–Appellee.**

**Nos. 99–9357(L), 99–9413(XAP).**

United States Court of Appeals, Second Circuit.

Argued: June 5, 2000

Decided: Aug. 1, 2000

Louis R. Martinez (Richard Ritorto, on the brief), Martinez & Ritorto, P.C., New York, NY, for Defendant–Appellant–Cross–Appellee.

Steven R. Pounian, Kreindler & Kreindler, New York, NY, for Plaintiff–Appellee–Cross–Appellant.

Before: FEINBERG and CABRANES, Circuit Judges, and GEORGE, District Judge.*

Judge FEINBERG dissents in a separate opinion.

JOSÉ A. CABRANES, Circuit Judge:

The question presented in this diversity action is whether the New York doctrine of primary assumption of the risk bars plaintiff's claim for the wrongful death of her husband, Richard Lee Goodlett ("Goodlett"). Goodlett died as a result of a midair collision immediately following the finish of an airplane race in which he and defendant Christopher Kalishek ("Kalishek") had participated. Kalishek appeals from a judgment of the United States District Court for the Eastern District of New York (Arthur D. Spatt, *Judge*), entered September 30, 1999, after a jury trial, finding him partially liable for Goodlett's death. We agree with Kalishek that plaintiff's action is barred under New York law by the doctrine of primary assumption of the risk, and therefore we reverse the judgment of the District Court.[1]

I.

The facts relevant to this appeal may be stated briefly and, unless noted otherwise, are undisputed. The action arises out of a midair collision on June 22, 1997 between an airplane flown by Goodlett and an airplane flown by Kalishek at Gabreski Airport in Westhampton Beach, New York. Goodlett and Kalishek were participants in an air race involving four single-seat home-built airplanes powered by car engines that had been modified by each pilot for use in air racing. The race was conducted around a two-mile oval race–course, marked by six inflatable pylons, with a race lane 250 feet wide. During the race, the pilots flew their airplanes at altitudes of 30 to 150 feet and at speeds between 100 and 200 miles per hour.

The air race that resulted in Goodlett's death was organized by the Formula V Air Racing Association (the "Association"), an organization—of which Goodlett was President—composed at the time of six active race pilots and approximately 20 non–pilot members. The Association established race pilot qualifications, technical specifications for airplanes, and competition rules for the sport of "Formula V air racing." In several ways, the Association emphasized to prospective pilots the risks inherent in the sport of air racing. In a section of the Association's "Guide for the New Air Race Pilot" titled "RISKS," for example, the Association warned participating pilots:

> Air racing ... contains an element of danger. Pilots have been killed in air racing accidents ... [ellipsis in original] you must be aware that the potential for injury or death is present.... The race pilot's greatest fear is a mid-air collision between two race–planes during a race. Several mid-air collisions have occurred during the history of air racing; usually both pilots are killed.

---

* The Honorable Lloyd D. George, of the United States District Court for the District of Nevada, sitting by designation.

1. In a cross-appeal, plaintiff seeks a new trial with respect to the issue of damages. In light of our conclusion that plaintiff's action is barred altogether, her cross-appeal is moot.

In addition, pilots were cautioned about the "dangers inherent in participation" and the "history of air racing accidents" both when they applied for certification as race pilots and before the start of each race.

The accident that gave rise to this action occurred approximately 14 seconds after Goodlett and Kalishek crossed the finish line in the June 22, 1997 race. Goodlett finished the race in second place, well behind the first-place finisher but not far ahead of Kalishek (who was, in turn, not far ahead of the fourth-place finisher). After crossing the finish line, both Goodlett and Kalishek initially proceeded straight ahead at full power, and race speed, approximately 30 to 50 feet above the ground. The parties dispute what happened next—whether Goodlett made a sharp left turn around one of the race-course pylons as if he were continuing to race or whether Goodlett initiated the proscribed landing procedures—but, in any event, Kalishek followed Goodlett into a left-hand turn. As Goodlett and Kalishek were turning, their airplanes collided. The collision caused both airplanes to crash to the ground, resulting in Goodlett's death and serious injuries to Kalishek.

Plaintiff, Goodlett's surviving wife, filed the present complaint in October 1997, alleging that Kalishek's negligence caused Goodlett's death.[2] The complaint did not allege intentional or reckless misconduct on the part of Kalishek. Notwithstanding a pending motion for summary judgment by Kalishek, a jury trial was commenced on August 24, 1999. At the close of plaintiff's evidence and again at the close of all the evidence, Kalishek moved for judgment as a matter of law on the ground that plaintiff's action was barred by New York's doctrine of primary assumption of the risk. In a decision from the bench, the District Court found that the doctrine would have barred plaintiff's action had the collision between Goodlett and Kalishek occurred during the race itself. However, because the collision occurred after the finish of the race, the District Court concluded that the doctrine was inapplicable and that Goodlett's assumption of the risk, if any, went to the issue of comparative fault, which was a question for the jury under N.Y. C.P.L.R. § 1411 (McKinney 1997). Accordingly, the District Court denied Kalishek's motions and submitted the case to the jury.

On September 9, 1999, the jury returned a verdict finding that Goodlett was 60% at fault and Kalishek was 40% at fault for the accident. The jury awarded plaintiff damages for past loss of support, future loss of support, and conscious pain and suffering.[3] After reducing the award for future loss of support to present value and decreasing the total damages in proportion to Goodlett's share of the fault, the District Court entered judgment against Kalishek in the sum of $390,213. This appeal followed.

## II.

■ The parties agree that New York law applies to this wrongful death action. Under New York law, assumption of the risk is generally not an absolute defense to a negligence action, let alone an issue of law for the court to decide. *See* N.Y. C.P.L.R. § 1411 (establishing that, in a personal injury or wrongful death action, "the culpable conduct attributable to the claimant ..., including ... assumption of risk, shall not bar recovery," but will "diminish[ ]" the damages "otherwise recover-

2. In his answer, Kalishek asserted a counterclaim, alleging that Goodlett's negligence or recklessness had caused Kalishek's personal injuries. The counterclaim was later settled.

3. In connection with whether Goodlett was partially at fault for the accident, the jury was asked the following question:

Did the defendant CHRISTOPHER KALISHEK prove that the decedent RICHARD GOODLETT knew and fully understood, or should have known and fully understood, the risk of death by participating in this air race, and that he assumed the risk of death by such participation?
The jury answered this question in the affirmative.

**36**

able" by the claimant in proportion to his culpable conduct). *See generally Arbegast v. Board of Educ. of S. New Berlin Cent. Sch.,* 65 N.Y.2d 161, 165–70, 490 N.Y.S.2d 751, 480 N.E.2d 365 (1985) (discussing New York law before and after enactment of C.P.L.R. § 1411 in 1975). In *Turcotte v. Fell,* 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), however, the New York Court of Appeals effectively established an exception to this rule for injuries sustained as a result of participation in a sport or recreational activity. By electing to participate in such an activity, the Court of Appeals reasoned, an individual "consent[s] ... to those injury-causing events which are known, apparent, or reasonably foreseeable consequences of the participation." *Id.* at 439, 510 N.Y.S.2d 49, 502 N.E.2d 964. This consent operates to relieve other participants in the activity of a duty to use reasonable care, *see id.* at 437–38, 510 N.Y.S.2d 49, 502 N.E.2d 964, and, absent evidence of "reckless or intentionally harmful conduct," an action for personal injury or wrongful death will therefore be barred *as a matter of law, id.* at 437, 510 N.Y.S.2d 49, 502 N.E.2d 964; *see id.* at 439–40, 510 N.Y.S.2d 49, 502 N.E.2d 964.

█ Although similar in nature and effect, the so-called *"primary* assumption of the risk" doctrine differs analytically from the *traditional* assumption of the risk doctrine that was abolished as an absolute defense to liability by C.P.L.R. § 1411. As explained by one New York court, the traditional assumption of the risk doctrine

is akin to comparative negligence; it does not bar recovery, but diminishes recovery in the proportion to which it contributed to the injuries.... [In contrast,] the doctrine of primary assumption of risk is not a measure of plaintiff's comparative fault, but a measure of the defendant's duty of care. Primary assumption of risk eliminates ... the tortfeasor's duty of care to the plaintiff and ... constitutes a complete bar to recovery, notwithstanding [C.P.L.R. § 1411].

*Lamey v. Foley,* 188 A.D.2d 157, 594 N.Y.S.2d 490, 494 (4th Dep't 1993); *see also Turcotte,* 68 N.Y.2d at 437–39, 510 N.Y.S.2d 49, 502 N.E.2d 964 (explaining why the common law doctrine of primary assumption of the risk was unaffected by the enactment of C.P.L.R. § 1411). Commentators have nevertheless criticized the continuing vitality of the doctrine of primary assumption of the risk as inconsistent with the comparative negligence regime established by § 1411. *See, e.g.,* Lee S. Michaels & Paul C. Campbell, *1993–94 Survey of New York Law: Tort Law,* 45 Syracuse L.Rev. 693, 723 (1995). Notwithstanding this criticism, our obligation in this diversity case is to apply New York law as the New York Court of Appeals would apply it. *See, e.g., Rounds v. Rush Trucking Corp.,* 211 F.3d 185, 188 (2d Cir.2000). Therefore, unless and until the Court of Appeals disavows the doctrine of primary assumption of the risk, we are bound to apply it when appropriate.

█ According to the New York Court of Appeals, the inquiry into whether an individual has assumed the risks inherent in a sport or recreational activity "includes consideration of the participant's knowledge and experience in the activity generally." *Turcotte,* 68 N.Y.2d at 440, 510 N.Y.S.2d 49, 502 N.E.2d 964; *see also Rutnik v. Colonie Ctr. Court Club Inc.,* 249 A.D.2d 873, 672 N.Y.S.2d 451, 452 (3d Dep't 1998) ("[W]here the injured party had previously participated in the sports activity on numerous occasions it is not unreasonable to conclude that he or she assumed the obvious risk of injury in participating in that activity." (internal quotation marks and ellipsis omitted)). However, for purposes of determining whether the doctrine of primary assumption of the risk negates a defendant's duty of care— thereby barring a plaintiff's action— "knowledge plays a role but inherency is the sine qua non." *Morgan v. State,* 90 N.Y.2d 471, 484, 662 N.Y.S.2d 421, 685 N.E.2d 202 (1997). Thus, for example, the risks of being bumped or kicked by a

horse during a race or exhibition, *see Turcotte,* 68 N.Y.2d at 440–41, 510 N.Y.S.2d 49, 502 N.E.2d 964; *Norkus v. Scolaro,* 267 A.D.2d 666, 699 N.Y.S.2d 550, 551 (3d Dep't 1999); *Lewis v. Erie County Agricultural Soc'y,* 256 A.D.2d 1114, 684 N.Y.S.2d 733, 734 (4th Dep't 1998); *Rubenstein v. Woodstock Riding Club Inc.,* 208 A.D.2d 1160, 617 N.Y.S.2d 603, 604–05 (3d Dep't 1994), of crashing at the end of a bobsled run or after sledding down a hill, *see Morgan,* 90 N.Y.2d at 479–81, 662 N.Y.S.2d 421, 685 N.E.2d 202; *Hernandez v. City of New York,* 267 A.D.2d 280, 699 N.Y.S.2d 901, 901 (2d Dep't 1999), of failing to execute properly a martial arts technique, *see Morgan,* 90 N.Y.2d at 481–82, 662 N.Y.S.2d 421, 685 N.E.2d 202, of paralysis caused by a block in a high school football game, *see Benitez v. New York City Bd. of Educ.,* 73 N.Y.2d 650, 655, 543 N.Y.S.2d 29, 541 N.E.2d 29 (1989), of slipping or falling during various sports played outdoors, *see Flores v. City of New York,* 266 A.D.2d 148, 699 N.Y.S.2d 345, 346 (1st Dep't 1999) (outdoor basketball); *Sheridan v. City of New York,* 261 A.D.2d 528, 690 N.Y.S.2d 620, 620 (2d Dep't 1999)

(same); *Collins v. City of New York,* 251 A.D.2d 443, 674 N.Y.S.2d 399, 399 (2d Dep't 1998) (same); *Rubin v. Hicksville Union Free Sch. Dist.,* 247 A.D.2d 601, 669 N.Y.S.2d 359, 360 (2d Dep't 1998) (lacrosse); *Morales v. New York City Hous. Auth.,* 187 A.D.2d 295, 589 N.Y.S.2d 456, 457 (1st Dep't 1992) (football), and of being struck by a ball or bat during a game of baseball or stickball, *see Steegmuller v. Siegel,* 202 A.D.2d 855, 609 N.Y.S.2d 359, 359 (3d Dep't 1994); *Checchi v. Socorro,* 169 A.D.2d 807, 565 N.Y.S.2d 175, 176 (2d Dep't 1991); *Cuesta v. Immaculate Conception Roman Catholic Church,* 168 A.D.2d 411, 562 N.Y.S.2d 537, 537 (2d Dep't 1990), "are risks which various participants are legally deemed to have accepted personal responsibility for because they commonly inhere in the nature of those activities," *Morgan,* 90 N.Y.2d at 484, 662 N.Y.S.2d 421, 685 N.E.2d 202.

■ With these principles and examples of New York law in mind, we are confident that the New York Court of Appeals would hold that the present action is barred by the doctrine of primary assumption of the risk.[4] The sport of Formula V

---

4. In contrast to Judge Feinberg, we do not believe that certification to the New York Court of Appeals is appropriate. Under our case law, certification is improper "where the question does not present a complex issue, there is no split of authority and 'sufficient precedents exist for us to make [a] determination.'" *Tinelli v. Redl,* 199 F.3d 603, 606 n. 5 (2d Cir.1999) (quoting *McCarthy v. Olin Corp.,* 119 F.3d 148, 153–54 (2d Cir.1997)). Here, although the specific question presented by this unusual case has not been confronted by the New York courts, we are hardly writing on a blank slate; to the contrary, as the above *partial* list of New York primary-assumption-of-risk cases makes plain, sufficient precedents exist for us to make a prediction of how the New York Court of Appeals would decide the question before us.

The dissent's concern that the New York Court of Appeals could reject our interpretation of New York law, thereby denying plaintiff "the benefit of the ruling of the state's highest court on a controlling issue of state law," *post* at [40], is misplaced. By filing her state law claim in a federal forum, plaintiff "knew that any open question of state law would be decided by a federal as opposed to a

New York state court." *DeWeerth v. Baldinger,* 38 F.3d 1266, 1273 (2d Cir.1994). Thus, even assuming *both* that the New York Court of Appeals is someday confronted with the question presented by this case *and* decides the question differently—possibilities we consider extremely remote—the state court's decision would "not impugn the integrity of [our] decision or the fairness of the process that was accorded [the plaintiff]." *Id.; see id.* ("[P]laintiffs elected to proceed in the federal forum, thereby voluntarily depriving themselves of the opportunity to attempt to persuade the [state court]." (internal quotation marks omitted)).

Finally, we note that, in response to questions at oral argument, *both* parties voiced their opposition to certification—a factor that should be given substantial (albeit not dispositive) weight in the analysis. *See, e.g., L. Cohen & Co. v. Dun & Bradstreet, Inc.,* 629 F.Supp. 1419, 1424 (D.Conn.1986). In short, the interests of comity, federalism, judicial economy, and fairness to the parties are all served by our deciding this case ourselves rather than adding to the burdens already borne by the litigants and the New York Court of Appeals.

air racing involves flying small home–built airplanes using converted car engines in tight formation, at speeds of 100 to 200 miles per hour, and at altitudes of 30 to 150 feet. The risk of a fatal crash, whether as a result of a midair collision or some other cause, plainly inheres in one's participation in this sport, as is evidenced by the fact that there had been several accidents in previous air races that resulted in death or serious injury to pilots and the fact that the sponsoring Association explicitly warns pilots that there is a risk of midair collisions (and that such collisions "usually" result in the deaths of both pilots).

Further, Goodlett was obviously aware of the risks involved: He had been flying airplanes for over 23 years, and had worked as both a commercial pilot and a flight instructor; he had participated in a number of previous Formula V air races (and, on several occasions, was forced to make emergency landings due to engine failure); and, at the time of his death, he served as President of the Association, the organization that sponsors the air races and cautions pilots about "the potential for injury or death." In short, "[t]he accident in this case was solely the result of dangers and calculations inherent in a highly dangerous sport," *id.* at 486, 662 N.Y.S.2d 421, 685 N.E.2d 202, and these dangers were both "fully comprehended" by Goodlett and "perfectly obvious," *Turcotte*, 68 N.Y.2d at 439, 510 N.Y.S.2d 49, 502 N.E.2d 964. Accordingly, the doctrine of primary assumption of the risk applies, and Kalishek may not be held liable for Goodlett's death.

■  Plaintiff's arguments against application of the doctrine—that Goodlett did not *expressly* consent to assume the risk of death, that the rules and regulations governing air races imposed on Kalishek a duty of reasonable care, and that the collision occurred after the finish of the race—are without merit. First, under the doctrine of *primary* assumption of the risk, *express* consent is immaterial because consent is "*implied* from the act of the elect-

ing to participate in the activity." *Turcotte*, 68 N.Y.2d at 439, 510 N.Y.S.2d 49, 502 N.E.2d 964 (emphasis added). Second, whether or not race pilots are governed by rules and regulations when flying, the doctrine of primary assumption of the risk operates to "relieve" a defendant of his legal duty to use reasonable care. *Turcotte*, 68 N.Y.2d at 441, 510 N.Y.S.2d 49, 502 N.E.2d 964; *accord Morgan*, 90 N.Y.2d at 484, 662 N.Y.S.2d 421, 685 N.E.2d 202; *see also* N.Y. C.P.L.R. § 1411 Practice Commentary C1411:2, at 566 ("'[P]rimary' assumption of risk *eliminates* the defendant's duty of care to the plaintiff . . . ." (emphasis added)). Lacking a legal duty to use reasonable care, Kalishek may not be held liable for otherwise negligent conduct. *See Turcotte*, 68 N.Y.2d at 438, 510 N.Y.S.2d 49, 502 N.E.2d 964 ("[T]he defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence." (internal quotation marks omitted)); *cf. id.* at 441, 510 N.Y.S.2d 49, 502 N.E.2d 964 (applying the doctrine of primary assumption of the risk to horse racing despite a municipal regulation prohibiting "foul riding").

■  Finally, contrary to the District Court (and the suggestion of the dissent), we conclude that it is legally irrelevant that the collision between Goodlett and Kalishek occurred 14 seconds after the nine-minute race finished rather than during the race proper. Under *Turcotte* and *Morgan*, a participant in an inherently risky activity consents to any risks that "flow from such participation." *Id.* at 484, 662 N.Y.S.2d 421, 685 N.E.2d 202. Thus, in *Morgan*, in which the bobsledding accident occurred after the plaintiff had crossed the finish line, *see* 90 N.Y.2d at 480, 662 N.Y.S.2d 421, 685 N.E.2d 202, the New York Court of Appeals held that the plaintiff had assumed the relevant risk, *see id.* at 486, 662 N.Y.S.2d 421, 685 N.E.2d 202. Here, common sense dictates that the risk of an accident occurring immediately after an air race finishes, when the

race pilots continue to fly their airplanes at race speed—that is, 100 to 200 miles per hour—and in tight formation, is a risk that "flow[s]" from participation.[5]

### III.

In sum, we conclude that the doctrine of primary assumption of the risk applies to this action and, thus, that Kalishek owed Goodlett "no more than a duty to avoid reckless or intentionally harmful conduct." *Turcotte*, 68 N.Y.2d at 437, 510 N.Y.S.2d 49, 502 N.E.2d 964. Because there is no allegation, let alone proof, that Kalishek's conduct was reckless or intentionally harmful, plaintiff's wrongful death claim is barred as a matter of law. Accordingly, the judgment of the District Court is reversed and the complaint is dismissed.

FEINBERG, Circuit Judge, dissenting:

One of the complications of diversity jurisdiction is that the federal courts are called upon to make pronouncements upon state law that may later prove wrong. On the highly unusual facts before us, this wrongful death case presents a question of New York state law that will control the outcome of this appeal, as to which there is no controlling precedent. See Local Rule § 0.27; N.Y. Comp.Codes R. & Regs. Tit. 22, § 500.17(a) (McKinney's 2000 N.Y. Rules of Court). Because I believe the question of state law should be certified to the New York State Court of Appeals, I respectfully dissent.

The majority believes that two decisions of the New York Court of Appeals, *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), and *Morgan v. State*, 90 N.Y.2d 471, 662 N.Y.S.2d 421, 685 N.E.2d 202 (1997), govern the outcome of this appeal. According to the majority, these cases require us to hold that when Goodlett participated in the air race, he

assumed any risks that "flow from such participation," *Morgan*, 90 N.Y.2d at 484, 662 N.Y.S.2d 421, 685 N.E.2d 202, including the risk of collision after the race was over. However, *Turcotte* explains that among the factors to be considered in assessing whether such a plaintiff assumed the risk are "the ultimate purpose of the game and the method or methods of winning it[, and] the relationship of the defendant's conduct to the game's ultimate purpose, especially his conduct with respect to rules and customs whose purpose it is to enhance the safety of the participants." *Turcotte*, 68 N.Y.2d at 440, 510 N.Y.S.2d 49, 502 N.E.2d 964. The district court judge, with over a decade of experience interpreting New York law as a state court judge, concluded that the doctrine of primary assumption of the risk would have barred plaintiff's action had the collision occurred during the race itself. However, because the collision occurred after the race finished, the judge concluded that the doctrine was inapplicable, and that Goodlett's assumption of the risk, if any, went to the issue of comparative fault, which was a question for the jury. Thus, the judge noted that

> The competition was over. The flying in a constricted narrow low area at high speed was concluded. The pilots were getting ready to land. A normal procedure with an airplane. They were in the same order as at the conclusion of the race, very reasonable and logical and apparently safe.

The judge further noted that "it is a different, completely different aura after the race is over. There is no more competition, and they are maneuvering to land, which happens many times." The judge obviously believed that after the race was won and its ultimate purpose achieved, the competitors' interests are no longer ad-

---

**5.** Notably, the District Court itself stated at one point during the trial:

> There is always a risk of collision. You people have a microscopic view of what goes on in the real world because you are

so intense on this case. There [are] tremendous risks.... Even after the race. That's common sense, isn't it? Do we lose our common sense?

verse, both are under a duty to conclude the competition safely, and the pilots no longer assumed the risks inherent in the *competition*.[1] On this theory, the judge refused to take from the jury the issues before it. The jury then found that Goodlett was 60% at fault and Kalishek 40% at fault for the accident, which resulted in a judgment for plaintiff against Kalishek of $390,213.

The majority is "confident" that the New York Court of Appeals would hold that the present action is barred by the doctrine of primary assumption of the risk. I do not share that confidence. Indeed, it is not at all clear to me that the judge erred in concluding that the case should go to the jury. It is certainly true, as the majority notes, that all pilots were aware of the risks of participation in air races. However, the evidence suggests that a different set of expectations applied to post-race flight: (1) according to the National Transportation Safety Board, there have been no airplane accidents after the end of a race; (2) defendant Kalishek admitted that he was never aware of any risk of a post-race collision; and (3) Kalishek's expert testified that he was not aware of any post-race collisions either. After all, the Association's guide for new pilots warns that, "The race pilot's greatest fear is a mid-air collision between two race–planes *during a race.*" (Emphasis added.)

I would certify to the New York Court of Appeals the question whether, on the facts before us, Goodlett assumed the risk of collision after the race was over, thereby completely barring this action by his executrix. If we do not certify the issue now, the New York Court of Appeals can at any time in the future reject the majority's interpretation of New York law, as it has occasionally done in the past. Compare, e.g., *DeWeerth v. Baldinger*, 836

F.2d 103, 109–10 (2d Cir.1987), with *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 318, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991); compare also *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir.1981) (interpreting Tennessee law), with *Elvis Presley Int'l Mem. Found. v. Crowell*, 733 S.W.2d 89, 97 (Tenn.Ct. App.1987) (rejecting this court's interpretation). If it does so, the decedent's estate will have been denied the benefit of the ruling of the state's highest court on a controlling issue of state law. *See DeWeerth v. Baldinger*, 38 F.3d 1266, 1273–74 (2d Cir.1994) (rejecting motion for relief from the judgment based on this Court's error in interpreting New York law); *see also id.* at 1273–74 ("The very nature of diversity jurisdiction leaves open the possibility that a state court will subsequently disagree with a federal court's interpretation of state law.").

One of the basic reasons for a certification statute is to avoid the possibility of our misinterpreting state law. See Recommendation of the Law Revision Commission to the 1984 Legislature: Relating to Certification of Questions of Law to the Courts of Appeals, 1984 N.Y. Laws 2976, 2979 (McKinney's 1985) ("[T]he federal courts have sometimes failed to predict accurately the state position.") (citing Henry J. Friendly, Federal Jurisdiction: A General View 141–42 (1973)); see also Friendly at 143 ("All such cases [in which state law is unclear] are pregnant with the possibility of injustice."). Of course, should the New York Court of Appeals for any reason find it inappropriate to answer the question of state law, it is free to decline to answer, as it has done in the past. See, e.g., *Tunick v. Safir*, 94 N.Y.2d 709, 709 N.Y.S.2d 881, 731 N.E.2d 597 (2000), declining to answer question certi-

---

1. *Morgan* does not refute the "finish line" distinction drawn by the district court because the plaintiff in *Morgan* did not sue a fellow bobsledder, but the owner of the bobsled track. See *Morgan*, 90 N.Y.2d at 481, 662 N.Y.S.2d 421, 685 N.E.2d 202. While the relationship between a sledder and a track operator remains the same before, during, and after the race, the relationship between competitors changes greatly once the competition is over.

fied by *Tunick v. Safir*, 209 F.3d 67 (2d Cir.2000).

I see no persuasive reason why, in a situation where the stakes are high and the law is arguably unclear, we should not try to make sure that we properly understand New York law before proceeding further. For these reasons, I decline to join the majority opinion and respectfully dissent.