344 F.3d 154
 Sharwline NICHOLSON, individually and on behalf of her infant children, Destinee Barnett and Kendell Coles and on behalf of all others similarly situated; Destinee Barnett, Kendell Coles, infants; Sharlene Tillett, individually and on behalf of infants Winston Denton and Uganda Gray; Ekaete Udoh, individually and on behalf of her infant children, Edu Udoh, Ima Udoh, Nsikak Udoh and Asuno Udoh; and J.A. and G.A., infants on behalf of all others similarly situated, Plaintiffs-Appellees,
v.
Nicholas SCOPPETTA, individually and as Commissioner of Administration for Children's Services; City of New York; George E. Pataki, as Governor of the State of New York; John E. Johnson; and State of New York, Defendants-Appellants,
Nat Williams, individually and as manager; Bethy Victorin, Denise Degannes, Samuel Halstion, Lisa Clark, Howard Safir, Vivian Lopez, also known as Jane Lopez, Arlene Irizarry, Vincent Stropoli, Brian Martin, also known as James Roe, Jonathan Lippman, Jane Doe, individually and attorney for the Administration for Children's Services John Doe, individually and as Police Officers, Ymsi Holloway, individually and as Supervisor, Cheryl Constantine, individually and as Supervisor, Nidia Cordero, individually and as Supervisor, Dorabella Delamothe, individually and as Manager, Shakira Panther-Wilburg, individually and as caseworker, Sylvia Parris, individually and as a caseworker for the Administration for Children's Services, Jane Dorabella, individually and as supervisor for the Administration for Children's Services and John Tai, individually and as supervisor for the Administration for Children's Services, Defendants.
 Docket No. 02-7079.
 United States Court of Appeals, Second Circuit.
 Argued: April 4, 2003.
 Decided: September 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Carolyn A. Kubitschek (David J. Lansner, Joanne N. Sirotkin, Brett S. Ward, on the brief), Lansner & Kubitschek, New York, NY, Jill M. Zuccardy, Christine Fecko, Sanctuary for Families, Center for Battered Women's Legal Services, New York, NY, on behalf of Plaintiffs-Appellees Sharwline Nicholson, Sharlene Tillett, Ekaete Udoh, and others similarly situated.
 Barrie Goldstein (Monica Drinane, Attorney-in-Charge, Henry Weintraub, Karen Walker Bryce, Judy Waksberg, Betsy Kramer, of counsel), The Legal Aid Society, Juvenile Rights Division, New York, NY, Karen Freedman, Executive Director, Lawyers for Children, Inc., New York, NY, on behalf of Plaintiffs-Appellees Destinee Barnett, Kendell Coles, Winston Denton, Uganda Gray, Edu Udoh, Ima Udoh, Nsikak Udoh, Asuno Udoh, J.A., and G.A., and all others similarly situated.
 
 
 1
 Alan G. Krams, Assistant Corporation Counsel (Leonard Koemer, Jonathan Pines, Martha Calhoun, Carolyn Wolpert, Krisin M. Helmers, of counsel), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, on behalf of Defendants-Appellants Nicholas Scoppetta and the City of New York.
 
 
 2
 Robert H. Easton, Assistant Solicitor General (Caitlin J. Halligan, Solicitor General, Michael S. Belohlavek, Deputy Solicitor General, of counsel), for Eliot Spitzer, Attorney General of the State of New York, New York, New York, on behalf of Defendant-Appellants George E. Pataki, John E. Johnson, and the State of New York.
 
 
 3
 Lawrence S. Lustberg, Philip G. Gallagher, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., Newark, NJ, Lenora M. Lapidus, Emily J. Martin, Women's Rights Project, American Civil Liberties Union Foundation, New York, NY, on behalf of Amicus Curiae American Civil Liberties Union.
 
 
 4
 Laura K. Abel, David S. Udell, Brennan Center for Justice, New York, NY, on behalf of Amicus Curiae Brennan Center for Justice.
 
 
 5
 Susan Lambiase, Marcia Robinson Lowry (Eric Thompson, of counsel), Children's Rights, New York, NY, Amit Tandon, White & Case, LLP, New York, NY, on behalf of Amici Curiae Children's Rights, Citizens' Committee for Children of New York, Inc., Judge David J. Bazelon Center for Mental Health Law, Juvenile Law Center, National Center for Youth Law and Youth Law Center.
 
 
 6
 Yisroel Schulman (Kim Susser, of counsel), New York Legal Assistance Group, New York, NY, on behalf of Amici Curiae Domestic Violence Report, Greater Upstate Law Project, the Greater Five Towns Young Men's & Young Women's Hebrew Association, InMotion, Kansas Coalition Against Sexual and Domestic Violence, Nassau County Coalition Against Domestic Violence, National Coalition Against Domestic Violence, New York Legal Assistance Group, SAKHI for South Asian Women, and STEPS to End Family Violence.
 
 
 7
 Wilbur McReynolds, Amicus Curiae pro se.
 
 
 8
 Joanne C. Fray, Law Offices of Joanne C. Fray, Lexington, MA, on behalf of Amicus Curiae National Coalition for Child Protection Reform, Inc.
 
 
 9
 Fernando R. Laguarda, Noam B. Fischman, M. Elizabeth Gomperz, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., on behalf of Amici Curiae National Network to End Domestic Violence and National Network to End Domestic Violence Fund.
 
 
 10
 Lawrence E. Jacobs (Frank S. Moseley, Zachary S. McGee, Kelli Stenstrom, Michael Farbiarz, Elliot Moskowitz, John Gaffney, on the brief), Davis Polk & Wardwell, New York, NY, Michael Miller, Norman L. Reimer, New York County Lawyers' Association, New York, NY, on behalf of Amicus Curiae New York County Lawyers' Association.
 
 
 11
 Before: WALKER, Chief Judge, OAKES and KATZMANN, Circuit Judges.
 
 
 12
 Chief Judge JOHN M. WALKER, JR., dissents in a separate opinion.
 
 
 13
 KATZMANN, Circuit Judge.
 
 
 14
 Few matters are closer to the core of a State's essential function than the protection of its children against those who would, intentionally or not, do them harm. In this appeal, the City of New York and its chief child-welfare administrator challenge the determination of the United States District Court for the Eastern District of New York (Weinstein, J.) that the manner in which they have chosen to carry out this difficult task violates the Constitution. The District Court found that the City was at least inattentive to the custom or practice of its officers in "removing" children from the custody of a parent who had been battered by a spouse or paramour, based on the theory that the parent's failure to protect the child from witnessing the abuse was itself a form of child neglect. This practice, the District Court concluded, contravened protected substantive due process and procedural due process liberty interests of parents and children in staying together as a family. The District Court also held that the removals were unreasonable seizures, contrary to the safeguards of the Fourth Amendment. We agree that in some circumstances the removals may raise serious questions of federal constitutional law. We conclude, however, that uncertain issues of state law precede our own constitutional inquiry. Given our strong preference for avoiding unnecessary constitutional adjudication, as well as the importance of child safety to the State of New York, and the integral role New York's own courts play in the removal process, we choose to certify these state-law questions to the New York Court of Appeals.[1]
 
 Background
 The Removal Process
 
 15
 The State of New York has the power to monitor and protect against abuse or neglectful treatment of the State's children. See, e.g., N.Y. Fam. Ct. Act §§ 611-671, 1011-1085 (McKinney 1999 & Supp.2003). For the most part, actual enforcement of the child protection laws is carried out by counties and municipalities. In New York City, a city agency known as the Administration for Children's Services ("ACS") bears primary responsibility for child protection. ACS carries out its mission in cooperation with a number of public and private entities, which provide it with data and other support, and in partnership with the Family Court itself, which ultimately must give legal sanction to any of ACS's enforcement decisions. ACS is also supervised by a state agency, the Office of Children and Family Services ("OCFS").
 
 
 16
 Most of ACS's activity begins with a reference from the State Central Register for Child Abuse and Maltreatment ("SCR"), a division of OCFS. SCR maintains a telephone hotline with a toll-free number, staffed around the clock, for reports of child abuse, neglect, or maltreatment. N.Y. Soc. Serv. Law § 422(2)(a). Although anyone with pertinent information can contact the SCR, certain individuals, such as health care professionals, school officials, social service workers, day care center employees, and law enforcement personnel are required by law to report suspicions of abuse or neglect. Id. §§ 413, 414. SCR screens reports it receives to ensure that the allegations and identifying information are sufficient to begin an investigation. Id. § 422(2)(b). If the report passes this initial screening, SCR transmits the report as well as any background information to a field office in the county where the child is located. Id.
 
 
 17
 ACS is responsible for investigating reports involving children in New York City. When an ACS field office receives a report from SCR, an applications worker forwards it to a supervisor, who then assigns a caseworker to investigate. A child protective manager ("CPM") oversees the supervisor-caseworker team. The CPM must approve major decisions, such as removing a child from his or her home or prosecuting a parent.
 
 
 18
 By statute, ACS must complete its investigations of complaints referred by SCR within sixty days. Id. § 424(6), (7). At the conclusion of the investigation, ACS must determine whether there is "credible evidence" to support the allegations. Id. § 412(5). If ACS concludes there is such evidence, it declares the report "indicated." Id. § 412(12). Otherwise, it must declare the report "unfounded." Id. § 424(7). The SCR maintains a record of these findings, which it may disclose in certain circumstances. Id. § 422-a.
 
 
 19
 ACS's function is not limited to investigating and reporting instances of abuse or neglect. During the course of its investigation (or, if the report is "indicated," following an investigation), ACS may commence child protective proceedings in Family Court against a parent or guardian. Id. §§ 397(2)(b), 424(11); N.Y. Fam. Ct. Act § 1032(a).[2] ACS begins an action in Family Court by filing an "Article 10 petition," a reference to the section of the Family Court Act which provides for ACS's quasi-prosecutorial authority. The petition is drafted by an ACS attorney, after consultation with agency personnel.
 
 
 20
 Once ACS has filed a petition, the Family Court must hold a preliminary hearing "as soon as practicable," in order to determine whether the child's interests require protection pending a final order of disposition. N.Y. Fam. Ct. Act § 1027(a). The court has the power to order "removal" of the child — that is, placement of the child in the protective custody of someone other than the custodial parent or guardian. Id. § 1027(b)(i). However, the court may only order removal if it is necessary to avoid "imminent risk to the child's life or health." Id. "In determining whether removal... is necessary ... the court shall consider ... whether continuation in the child's home would be contrary to the best interests of the child and where appropriate, whether reasonable efforts were made prior to the date of the hearing ... to prevent or eliminate the need for removal." Id. Further, before ordering removal, the court must find that the imminent risk to the child could not be eliminated by instead exercising its power to issue a "temporary order of protection," directing the removal of a person or persons other than the child from the residence. Id. §§ 1027(b)(iv), 1029.
 
 
 21
 The Family Court Act recognizes that in some circumstances delaying removal until after a preliminary hearing would not best serve the child's welfare. If ACS determines that there is not enough time to file a petition and hold a preliminary hearing, it is authorized to seek, and the Family Court to issue, a preliminary order of removal. Id. § 1022. The court again must consider available alternative protective services, including the removal of threatening persons from the residence, in deciding whether to issue such an order. Id. Additionally, if ACS "has reasonable cause to believe" that there is not even time to obtain this expedited preliminary order, it may remove a child from the parent or guardian without any court order. Id. § 1024(a); N.Y. Soc. Serv. Law § 417. If ACS removes a child without a court order it must file a petition "forthwith," ideally within twenty-four hours, and in any event within no more than three business days. See N.Y. Fam. Ct. Act § 1026(c) & cmt. ACS must also "make every reasonable effort to communicate immediately with the child's parent," id. § 1026(a), and the parents of a child removed without a court order have the right to apply for a court hearing to secure the child's return, id. § 1028. This hearing must take place within three days of the parent's application, absent "good cause shown." Id. In deciding whether to return a child removed emergently, the court must consider the same factors as it would in making an initial decision to remove under sections 1022 or 1027. Id.
 
 
 22
 Instead of returning full custody of a removed child to a parent, the Family Court may parole the child to the parent pending the outcome of the proceedings. Testimony below suggested that parole is common. A paroled child returns to live with the parent, but subject to broad supervision by ACS. For instance, ACS may demand the right to make unannounced home visits, or that the parents participate in counseling, relocation, or other services.
 
 
 23
 After provisional arrangements for the child have been addressed, the court proceedings move to the fact-finding stage. The court first must determine whether the child has been abused or neglected. An abused child is one whose parent or guardian creates or allows a "substantial risk of," or actually inflicts, "physical injury to such child by other than accidental means," where such injury in turn would likely "cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ." N.Y. Fam. Ct. Act § 1012(e)(i), (ii). Abuse also includes various forms of sexual abuse. Id. § 1012(e)(iii). A neglected child is one "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care" in carrying out certain key parental obligations. Id. § 1012(f)(i). In particular, the parent or guardian must exercise care "in supplying the child with adequate food, clothing, shelter or education," id. § 1012(f)(i)(A), and can be found neglectful:
 
 
 24
 in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment; or by misusing a drug or drugs; or by misusing alcoholic beverages to the extent that he loses self-control of his actions; or by any other acts of a similarly serious nature requiring the aid of the court.
 
 
 25
 Id. § 1012(f)(i)(B).
 
 
 26
 Certain special evidentiary rules apply to the fact-finding hearing. Id. § 1046. Notably, the court must find that there is abuse or neglect by a preponderance of the evidence. Id. § 1046(b). The court cannot rely on the mental or emotional state of the child as a basis for its finding unless it concludes that the child's mental or emotional impairments are "clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child." Id. § 1012(h). The court can use "competent opinion or expert testimony" to make this determination, id. § 1046(a)(viii), and can order that a child "be made available for examination by a physician, psychologist or social worker," id. § 1038(c).
 
 
 27
 If the fact-finding hearing results in a finding of abuse or neglect, a "dispositional hearing," id. § 1045, at which the ultimate placement of the child is determined, follows. Id. § 1047. The court has wide latitude to decide the appropriate placement of the child, id. § 1052, and its options include placing the child in foster care for renewable one-year periods, id. § 1055. The court may also, ultimately, decide to terminate the rights of the original custodial parent or guardian and place the child permanently elsewhere. Id. § 1055(d); Matter of Dale P., 84 N.Y.2d 72, 614 N.Y.S.2d 967, 638 N.E.2d 506, 510 (1994).
 
 The Parties and Procedural History
 
 28
 The named plaintiffs Sharwline Nicholson, Sharlene Tillett, and Ekaete Udoh ("Ekaete") are mothers whose children were removed by ACS. The remaining named plaintiffs are children who have been removed by ACS, either temporarily or permanently, from the custody of their parents. In the case of each plaintiff, at least one of the grounds for removal was that the custodial mother had been assaulted by another individual, and had failed to prevent the child or children from being "exposed" to that incident of violence. The defendants include Nicholas Scoppetta, the ACS Commissioner, George E. Pataki, the Governor of New York, and a host of other city and state officials. Pataki and the other state defendants are named only in response to the appointed-counsel portion of the case, and do not figure further in this opinion.
 
 
 29
 Nicholson began this litigation in April of 2000 with a suit brought on behalf of herself and her two children. Her suit was later consolidated with the similar complaints of Tillett and Ekaete. In January of 2001, the plaintiffs moved for class certification. The District Court, pointing to potential conflicts between the interests of parents and children, split the plaintiffs into two subclasses: Subclass A was to represent battered custodial parents, and subclass B was to represent their children.[3] Nicholson v. Williams, 205 F.R.D. 92, 94, 100 (E.D.N.Y.2001). The court then certified each of the two sub-classes. Id. at 102.
 
 
 30
 Subclass A is presently defined as custodians of children removed or sought to be removed by ACS, with or without court order, "wholly or in part because the children reside in a home where battering of the custodian was said to have occurred." In re Nicholson, 181 F.Supp.2d 182, 183-84 (E.D.N.Y.2002). The class is limited to cases "where the children themselves have not been physically harmed by the non-battering custodian or threatened with harm by the non-battering custodian, or neglected by the non-battering custodian, and where protection of the children and their best interests can be accomplished by separation of the alleged batterer from the custodian and children or by other appropriate measures without removal of the children from the non-battering custodian."[4] Id. Subclass B is defined, in complementary fashion, as children of custodians in subclass A. Id. at 184. However, to account for an earlier settlement by an overlapping class, in which the class members waived claims accruing on or before December 16, 2000, subclass B includes only children who allege a constitutional harm that occurred after that date. Id.; see Nicholson v. Williams, 205 F.R.D. at 101.
 
 
 31
 In June of 2001, the plaintiffs moved for a preliminary injunction. Pursuant to Fed.R.Civ.P. 65, the District Court then held an extensive hearing on whether to grant the requested relief. The court heard testimony from dozens of witnesses, including the parents themselves, child-welfare experts, advocates with regular interactions with ACS, and ACS administrators. There were several hundred exhibits, among them a detailed audit by OCFS of a randomly selected sample of removals carried out by ACS. During the course of the hearing, which covered 24 days spread out from July until December of 2001, the District Court appears to have decided, preliminarily, that it was likely to find constitutional violations. See In re Nicholson, 2001 WL 1338834 (E.D.N.Y. Oct. 25, 2001). It therefore asked the parties to include, in their submissions and arguments, proposed remedies for the alleged violations. While the Commissioner of ACS was on the witness stand, the District Court discussed with him how ACS might satisfy the plaintiff's concerns on its own initiative, and indicated that the court was inclined to stay its injunction for six months in order for ACS to attempt reform on its own, free of the District Court's direction. Accordingly, although the District Court issued its preliminary injunction on Jan. 3, 2002, it stayed the effective date of nearly all of the injunction's provisions (except certain monitoring and reporting requirements) until June 22, 2002. In re Nicholson, 181 F.Supp.2d at 186. In the meanwhile, on March 18, 2002, the District Court issued a lengthy opinion explaining the basis for the injunction. See Nicholson v. Williams, 203 F.Supp.2d 153 (E.D.N.Y.2002).
 
 
 32
 This appeal followed. We denied the defendants' motion for a stay of the injunction pending appeal.
 
 
 33
 The District Court's Findings of Fact and Conclusions of Law
 
 
 34
 In its wide-ranging opinion, the District Court detailed the individual stories of ten representative subclass-A members and their children, surveyed the overall practices of ACS, and analyzed a variety of social science pertaining to the psychological effects of domestic violence and governmental responses to it. The court concluded, ultimately, that some of the practices lawfully attributable to ACS violated the constitutional rights of both sets of plaintiffs.
 
 
 35
 The centerpiece of the District Court's findings was its determination that in many removals, either with or without court order, the only substantiated basis for neglect was that the custodial parent allowed the child to witness the custodial parent being abused by another adult. Id. at 228, 250. Extrapolating from data provided by an OCFS audit, the District Court found that "ACS explicitly charges victims of domestic violence with neglect for having failed to protect children from witnessing domestic violence in approximately 234 cases each year." Id. at 209. The same data suggested that "about eighty children were removed by ACS in 1999 based solely on the presence of domestic violence," id. at 213 (emphasis added), and the court observed that if the data were read slightly differently, they would support a figure about twice that high, id. It also noted the testimony of a former family court judge that "in many instances the abused mother was separated from her children merely because she was abused," id. at 214, and reported on a demonstration project in the Bronx in which a single judge heard, in six months, "approximately forty cases" in which "ACS had removed children from their homes because, in essence, one of their parents ha[d] been the victim of domestic abuse," id. at 215 (internal quotation omitted). The District Court did not attempt to distinguish between cases in which removal was premised purely on the fact of prior domestic violence, and those in which removal was based on the possibility that future instances of domestic violence might jeopardize the physical or emotional welfare of a child.
 
 
 36
 The District Court also related the stories of several representative subclass A mothers who had been the object of removal proceedings where the only real basis for neglect was that the mother had been beaten. See id. at 181 (Sharlene Tillett); id. at 184-85 (Michele Garcia); id. at 186 (Michelle Norris); id. at 188 (Crystal Rhodes). In other cases, the District Court described removals where the batterer had not only assaulted the mother but also in some way threatened the physical safety of the child. See id. at 178-79 (Ekaete Udoh); id. at 189 (Shiqipe Berisha); id. at 192 (Xiomara C.).
 
 
 37
 The District Court found further that in many cases removal was unnecessary to prevent the child from witnessing further instances of domestic violence. The court noted that ACS focused most of its attention on the mother, so that it often overlooked the opportunity to remedy any alleged neglect by working with or removing the batterer. Id. at 210-11, 229. And, notwithstanding the preeminence of the mother, ACS frequently either did not consider or inadequately implemented other "service" options for the mother short of removal, such as counseling or relocation. Id. at 211-12, 229.
 
 
 38
 What is more, the District Court found, the removals are bad policy. As a practical matter, even temporary removals often last for many months, because the beginning of a fact-finding hearing is often delayed, and once commenced can be adjourned for long periods. Id. at 168. These delays, the court found, exacerbate the harms that children experience as a result of removal, which include stress resulting from the disruption of normal home life, trauma related to being placed in new home surroundings, and the general perils of foster care. Id. at 199. According to expert testimony at trial, young children, and, ironically, those who have been exposed to domestic violence, are especially vulnerable to these stresses. Id. Against this the District Court balanced extensive expert testimony about the psychological and emotional impact witnessing domestic violence might have on children. According to the studies cited by the court, there is a wide range of reactions, with some children exhibiting no evident harm, and others experiencing both short and long-term impact, ranging from depression and anxiety to "a propensity to use violence in future relationships." Id. at 197-98. While noting that there "was some disagreement among the experts about the likelihood and seriousness of the long-term effects experienced by children who witness domestic violence," id., the District Court cited favorably one expert who opined that "children rarely experience long-term effects from witnessing domestic violence." Id. at 199.
 
 
 39
 According to the District Court, top policy-makers at ACS knew of the practices alleged by the plaintiffs, and made little headway in changing them. Id. at 250. ACS's domestic violence practices, it said, were often mentioned in "recurring lawsuits, news articles, and committee reports detailing the problems." Id. The District Court found that ACS responded by making only cosmetic changes in its policy statements, id. at 219-20, which as a whole "offer contradictory guidance or no guidance at all," id. at 229, and generally had taken only "preliminary and insufficient steps" to train its staff to understand domestic violence issues, id. at 218.
 
 
 40
 As a result, the District Court concluded that the removals alleged by the plaintiffs were the result of an "official policy or custom" of ACS, such that ACS could be held liable for them in a suit under 42 U.S.C. § 1983. Id. at 232-33, 250. The court therefore went on to consider the plaintiffs' constitutional claims. It devoted the bulk of its analysis to the Due Process Clause. Noting that both parents and children have a procedural due process liberty interest in maintaining family integrity, id. at 235, 237-38, the District Court held that a governmental entity cannot simply presume, but must actually prove in each case, that the parent has committed conduct that renders them unfit to serve as the child's guardian. Id. at 237 (citing Stanley v. Illinois, 405 U.S. 645, 656-58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). It then concluded that ACS's removal practice amounted to an improper presumption that the battered mother was unfit. Id. at 252.
 
 
 41
 Similarly, the District Court pointed to cases identifying substantive due process protections for the family relationship. Id. at 242 (citing Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir.1999)). Balancing this interest against the putative interests asserted by ACS, the court found that "the defendants have no defensible interest in separating children from their abused mothers when this state act does not advance the child's safety and does adversely affect the child's physical and psychic well-being." Id. at 250. It also noted that the Fourth Amendment protected the plaintiff children against unreasonable seizures, id. at 246-47, and concluded in passing that the removals here were unreasonable, apparently for the same reasons that it thought they were contrary to substantive due process, id. at 251.
 
 
 42
 Accordingly, the District Court granted the preliminary injunction. In the main, the injunction prohibits ACS from carrying out ex parte removals "solely because the mother is the victim of domestic violence," In re Nicholson, 181 F.Supp.2d 182, 190 ¶ 3 (E.D.N.Y.2002), or from filing an Article Ten petition seeking removal on that basis, id. at 190-91 ¶ 6. The injunction also imposes a variety of procedural, consultation, training, and reporting requirements, such as a requirement that ACS inform mothers and children of their rights, id. at 190 ¶ 5, include domestic violence specialists in its consulting teams, id. at 192 ¶ 12, and report monthly to the District Court on its progress, id. at 193 ¶ 17.
 
 Discussion
 I. Standard of Review
 
 43
 "We review a district court's decision to grant a preliminary injunction for abuse of discretion. Abuse of discretion usually consists of clearly erroneous findings of fact or the application of an incorrect legal standard." Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003) (internal quotations, citation, and alteration omitted). The parties and the District Court agree that this was a "mandatory" injunction, that is, that it "will alter, rather than maintain, the status quo... by commanding some positive act." Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995). Therefore, in order to prevail, the plaintiffs must meet our "more rigorous likelihood-of-success standard." Fair Hous. in Huntington Comm., Inc. v. Town of Huntington, N.Y., 316 F.3d 357, 365 (2d Cir.2003); No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001) (per curiam). The relevant standard is thus that:
 
 
 44
 [A] mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." The "clear" or "substantial" showing requirement — the variation in language does not reflect a variation in meaning — thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.
 
 
 45
 Tom Doherty, 60 F.3d at 34 (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir.1985)) (internal citations omitted).
 
 II. The Section 1983 Causation Requirement
 
 46
 In addition to contesting the District Court's constitutional judgments, Commissioner Scoppetta and the City contend that they cannot be held liable for any alleged removals carried out by ACS staff. Because this argument, if true, would render our constitutional determinations moot, we consider it first. There is no respondeat superior liability in a suit, such as this one, brought pursuant to 42 U.S.C. § 1983. Ciraolo v. City of New York, 216 F.3d 236, 242 (2d Cir.2000). Before a municipal entity may be found liable, the plaintiffs must show that the municipality is "actually responsible" for their injuries, as through a "policy or custom" of the city. Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003). A policy or custom need not have "received formal approval through the body's official decision-making channels." Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir.2000) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).
 
 
 47
 The District Court did not abuse its discretion in finding that ACS's practice of effecting removals based on a parent's failure to prevent his or her child from witnessing domestic violence against the parent amounted to a policy or custom of ACS.[5] At oral argument, the City acknowledged candidly that ACS staff still carry out removals on that basis. The OCFS audit, although not perfect in all of its particulars, suggested that ACS carried out approximately 80 removals annually in which the sole ground for neglect was exposure to domestic violence. A former Family Court judge submitted a report indicating that he had personally seen a number of such cases. Testimony by several of the representative class members and their advocates indicated that the removal proceedings against the representative mothers had been brought on that basis. Moreover, ACS was undoubtedly aware that its officers at times engaged in this practice. Commissioner Scoppetta admitted as much in his testimony, and ACS has cited to us in its briefs a number of cases in which New York courts have approved removals wherein the mother's failure to prevent her child from witnessing domestic violence against the mother was the single or most significant basis for the neglect finding.
 
 
 48
 The City may also be liable simply by reason of its deliberate indifference to a known custom or practice of its employees — for example, by failing to train the employees to act otherwise. See City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "To support a claim that a municipality's failure to train amounted to `deliberate indifference,'" a plaintiff must show: "(1) that `a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation'; (2) that `the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; and (3) that `the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.'" Young v. County of Fulton, 160 F.3d 899, 903-04 (2d Cir.1998) (quoting Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir.1992) (internal alterations omitted)).
 
 
 49
 Assuming for the moment, without deciding, that the alleged practices would violate the Constitution, the evidence to which we just alluded supports a finding that all three prongs of the Walker test have been met. That is, we think it was not clear error for the District Court to conclude that city policy-makers knew that ACS staff would face instances where children had seen one of their parents battered, that there was a history of removals in that circumstance, and that (again assuming for the sake of argument that such removals are unconstitutional) wrong choices in those circumstances would cause ACS to deprive parents and children of their constitutional rights. As a result, we think that the constitutional violations, if any, are at least plausibly attributable to the City. Our remaining question, then, is whether the removals in fact are unconstitutional.[6]
 
 III. Abstention and Certification
 
 50
 Before reaching the constitutionality of the alleged removals, however, we must pause to consider whether a constitutional adjudication is absolutely necessary. We have a duty to avoid passing on the constitutionality of a statute where possible, see Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), especially when we are dealing with state rather than federal law, Arizonans for Official English v. Arizona, 520 U.S. 43, 75, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). "Normally this Court ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts." Id. (quoting Poe v. Ullman, 367 U.S. 497, 526, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)). Thus, we must abstain from our equity jurisdiction when a federal constitutional ruling could be avoided "by a controlling decision of a state court," and a state court decision can be pursued consistent "with full protection of the constitutional claim." R.R. Comm'n v. Pullman Co., 312 U.S. 496, 500-01, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
 
 
 51
 The District Court, citing the potential deprivation of rights that might result from the delay inherent in abstention, elected not to abstain under the Pullman doctrine. Nicholson v. Williams, 203 F.Supp.2d 153, 230 (E.D.N.Y.2002). Although the parties do not appeal that determination, we have an independent obligation to consider whether Pullman abstention is appropriate. See Ohio Bureau of Employment Servs. v. Hodory, 431 U.S. 471, 480 n. 11, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977). Indeed, abstention could not serve its proper function if the parties could, by their own decisions, force us to confront an otherwise avoidable constitutional question.
 
 
 52
 On appeal, we now have available to us an additional option not open to the District Court: We may certify questions of New York state law to the New York Court of Appeals. See N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(a). "Certification today covers territory once dominated by ... Pullman abstention." Arizonans, 520 U.S. at 75, 117 S.Ct. 1055. Indeed, we may elect to certify, rather than abstain, wherever it would "serve the same purpose [as Pullman] more efficiently." Allstate Ins. Co. v. Serio, 261 F.3d 143, 155 (2d Cir.2001) (Walker, C.J., concurring).
 
 
 53
 We need not certify or abstain unless "the [state] statute is `fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question,'" City of Houston v. Hill, 482 U.S. 451, 468, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (quoting Harman v. Forssenius, 380 U.S. 528, 534-35, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965)); Dorman v. Satti, 862 F.2d 432, 435 (2d Cir.1988) (holding that federal court may certify question to state court where the state "statute in question is `readily susceptible' to the proffered narrowing construction that would render an otherwise unconstitutional statute constitutional"). Nor are we obliged to avoid constitutional questions that are not "serious." Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (citing NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 499-501, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979)).
 
 
 54
 In weighing these questions we give some attention to the fact that our failure to abstain or certify may "prevent the informed evolution of state policy by state tribunals." Moore v. Sims, 442 U.S. 415, 430, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). We defer to state primacy in areas of traditional state concern, such as family law, id. at 435, 99 S.Ct. 2371, not only out of comity but also because the state is often far more expert than are we at understanding the implications of each decision in its practiced field, id. at 429-30, 99 S.Ct. 2371. The sinews of family law and the complex web of relationships underlying it are delicate indeed. We are loath to interpret the meaning of a state law without the guidance of the New York Court of Appeals, which has a deep understanding of the body of that law and its intersection with the full weave of policy.
 
 
 55
 In our view the plaintiffs' allegations present several substantial constitutional questions, each largely dependent on an antecedent interpretation of state law. As we indicated, the plaintiffs' principal arguments are that the removals violate both procedural and substantive due process rights of both parents and children, and interfere with the Fourth Amendment rights of removed children. We sketch each constitutional claim, and the accompanying state-law issues, in the sections that follow. Because our constitutional analysis differs slightly depending on the context of the removal, we examine separately ex parte removals by ACS and those removals confirmed by order of the Family Court.
 
 A. The Family Court Act
 
 56
 New York's statutory scheme governing removals leaves open a variety of interpretive questions. The Family Court Act defines a "neglected child" as one "whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent ... to exercise a minimum degree of care." N.Y. Fam. Ct. Act § 1012(f)(i). Impairment of mental or emotional condition must be "clearly attributable to the unwillingness or inability of the [custodian] to exercise a minimum degree of care toward the child." Id. § 1012(h). Thus, a fundamental interpretive question is what conduct satisfies the broad, tort-like phrase, "a minimum degree of care." The Court of Appeals has not yet addressed that question, which would be critical to defining appropriate parental behavior.
 
 
 57
 There is also some ambiguity in the statutory language authorizing removals pending a final determination of status. Following an emergency removal, whether ex parte or by court order, the Family Court must return a removed child to the parent's custody absent "an imminent risk" or "imminent danger" to "the child's life or health." Id. §§ 1022, 1027, 1028. At the same time, the Family Court must consider the "best interests of the child" in assessing whether continuing removal is necessary to prevent threats to the child's life or health. Id. §§ 1027(b)(i), 1028(b). Additionally, in order to support removal, the Family Court must "find[ ] that removal is necessary to avoid imminent risk." Id. § 1027(b)(1). How these provisions should be harmonized seems to us to be the province of the Court of Appeals.
 
 
 58
 To date, the State's lower courts have generally agreed that the statute permits the Family Court to find neglect based on a parent's failure to shield a child from witnessing domestic violence against the parent, and that removal may be an appropriate response to that neglect. See Matter of James MM, 294 A.D.2d 630, 740 N.Y.S.2d 730, 732 (2002); Matter of Carlos M., 293 A.D.2d 617, 741 N.Y.S.2d 82, 84 (2002); In re Lonell J., 242 A.D.2d 58, 673 N.Y.S.2d 116, 117-18 (1998). Several opinions of the Appellate Division seem to proceed directly from the factual premise that the child witnessed domestic violence to the conclusion that removal is appropriate, thereby at least suggesting that they presume as a matter of law that removal is always an appropriate option in such cases. See, e.g., Matter of Carlos M., 741 N.Y.S.2d at 84; In re Lonell J., 673 N.Y.S.2d at 117-18; see also Matter of Tantalyn TT, 115 A.D.2d 799, 495 N.Y.S.2d 740, 741 (1985) (appearing to hold parent strictly liable for act of abuse committed in parent's household by another). But see Matter of Bryan L., 149 Misc.2d 899, 565 N.Y.S.2d 969, 972-73 (1991) (declining to approve removal based on nothing more than presence of abuse in home). In our view, the Family Court Act does not clearly authorize a presumption that exposure to domestic violence can justify removal. The Act requires the Family Court to make and "state the court's findings which support the necessity of such removal." N.Y. Fam. Ct. Act § 1027(b)(i).
 
 
 59
 The fact that some of New York's lower courts have reached conclusions which arguably bear on the problems we confront today does not foreclose certification. No extant opinion of the lower courts has had to confront the full range of issues which animate us here. It is true that in exercising our diversity jurisdiction, we generally do not certify a question of state law when existing lower court opinion is uniform, even absent a truly authoritative interpretation by the state's highest court. See McCarthy v. Olin Corp., 119 F.3d 148, 153-54 (2d Cir.1997). There are important differences, however, between "a purely diversity case" in which the use of certification is simply a choice about the most efficient "decision-making process," and cases in which the decision to certify is "a choice trenching upon the fundamentals of our federal-state jurisprudence." Lehman Bros. v. Schein, 416 U.S. 386, 394, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) (Rehnquist, J., concurring). When certification serves the same function as abstention, "it is essential that we have the benefit of the [state] law's authoritative construction from the [State's] Supreme Court." Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 395, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). New York permits certification, without respect to the uniformity of its lower courts, when "there is no controlling precedent of the Court of Appeals." N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(a) (2002).
 
 
 60
 We see three basic reasons why even unanimity among a state's lower courts does not weigh against certification in cases where certification fills a constitutional-avoidance function. First, "the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." Arizonans, 520 U.S. at 79, 117 S.Ct. 1055. Any of our determinations of state law based upon prediction, rather than authoritative construction by the State's highest court, carries risk, especially if we turn a party out of court on a theory later repudiated by the State. See Goodlett v. Kalishek, 223 F.3d 32, 40 (2d Cir.2000) (Feinberg, J., dissenting). This "`possibility of injustice,'" id. (quoting Henry J. Friendly, Federal Jurisdiction: A General View 143 (1973)), is more acute when what is at stake are fundamental constitutional rights, which we presume the disappointed party should not be relegated to win for itself through the ordinary political process, see City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).
 
 
 61
 Second, and equally important, we must avoid unnecessary constitutional adjudication. See Ashwander v. TVA, 297 U.S. 288, 346-49, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). If the New York Court of Appeals could conceivably reject a question on ordinary statutory grounds, it is hard to understand in what sense our constitutional decision is "necessary." As the Supreme Court explained in Sims, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994, the concern of Pullman abstention is "that a federal court will be forced to interpret state law without the benefit of state-court consideration and therefore under circumstances where a constitutional determination is predicated on a reading of the statute that is not binding on state courts and may be discredited at any time — thus essentially rendering the federal-court decision advisory and the litigation underlying it meaningless." Id. at 428, 99 S.Ct. 2371 (emphasis added); cf. Rescue Army v. Mun. Court, 331 U.S. 549, 577-78, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947) (declining to reach constitutional question, despite ruling from state court, because later state proceedings might produce different interpretation).
 
 
 62
 Finally, it is difficult to use existing lower state court opinions to predict the result of our potential certified questions. As practiced both in the federal courts and the courts of New York, the avoidance canon only has relevance when the most ordinary or natural reading of the statute presents a constitutional question. If the preferred reading itself raises no constitutional question, then the avoidance canon is simply redundant. Therefore, it should not be surprising that New York's lower courts, not presented with the possibility that their interpretation might offend the Constitution, have selected what they see as the most natural reading of the Family Court Act. We cannot know from that choice whether even those lower courts would have concluded that there exists a less natural, but still permissible, reading of the statutes that avoids the constitutional issues we address here.
 
 
 63
 With these statutory possibilities in mind, we now turn to the plaintiffs' constitutional claims.
 
 B. The Constitutional Claims
 
 64
 The District Court's Order affects both ex parte removals by ACS as well as removals ordered or approved by the Family Court after a hearing. Since the two removal scenarios present somewhat different constitutional issues, we examine each in turn.
 
 1. Ex Parte Removals by ACS
 
 65
 a. Procedural Due Process
 
 
 66
 Under some readings of the Family Court Act, the plaintiffs' claims require us to decide questions of procedural due process we have previously left unresolved. "As a general rule ... before parents may be deprived of the care, custody, or management of their children without their consent, due process — ordinarily a court proceeding resulting in an order permitting removal — must be accorded to them." Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir.1999); see also Batten v. Gomez, 324 F.3d 288, 295 (4th Cir.2003) (citing Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Jordan by Jordan v. Jackson, 15 F.3d 333, 343 (4th Cir.1994)). However, "in emergency circumstances, a child may be taken into custody by a responsible State official without court authorization or parental consent." Tenenbaum, 193 F.3d at 594 (internal citations and quotations omitted). "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, ex parte or otherwise, for the child's removal, then the circumstances are not emergent." Id. The government must offer "objectively reasonable" evidence that harm is imminent. Gottlieb v. County of Orange, 84 F.3d 511, 520 (2d Cir.1996); Hurlman v. Rice, 927 F.2d 74, 81 (2d Cir.1991).
 
 
 67
 We have not decided, however, whether the "danger" that may at times justify ex parte removals encompasses emotional trauma of the kind ACS claims a child suffers in witnessing domestic violence against a parent. We have held that the peril of sexual abuse, or a risk that children will be "left bereft of care and supervision," Hurlman, 927 F.2d at 80; Robison v. Via, 821 F.2d 913, 922 (2d Cir.1987), can suffice to create an "emergency." Our opinion in Tenenbaum can, but perhaps need not, be read to suggest that risk of harms less grave than actual injury or sexual abuse cannot constitute "danger." In analyzing the child's Fourth Amendment rights, we concluded that unauthorized seizures could be justified only "where the state officers making the search or seizure have reason to believe that life or limb is in immediate jeopardy." Tenenbaum, 193 F.3d at 605 (internal quotation omitted). Significantly, we then remarked that this analysis "results in a test... similar to the procedural due-process standard." Id. (internal quotations omitted). That suggests that our view of "danger" was "similar" to threats to "life or limb." It seems unlikely, however, that we could have intended to define the scope of "danger" so indirectly. Nor could that restrictive definition be easily harmonized with our earlier holdings in Hurlman and Robison that threats of sexual abuse can also justify ex parte removal.
 
 
 68
 Ultimately, state law has a substantial role in shaping our understanding of "danger" in particular circumstances. If the State, after careful consideration, has determined that witnessing domestic violence even for the few hours required to seek a court order represents a danger to the child, one can probably read Tenenbaum not to foreclose a possible decision to defer in some measure to the State's view. State procedures for effecting ex parte removals will also likely play a significant role in our determination. Careful, well-documented analysis of each family will reduce the danger of erroneous deprivation, and increase our confidence that any given ex parte removal faithfully reflects New York's interest in enforcing its policy as to what constitutes a true "danger." See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
 
 
 69
 In short, then, we think there is a strong possibility that if New York law does not authorize ex parte removals, our opinion in Tenenbaum at least arguably could weigh in favor of finding a procedural due process violation in certain circumstances. If New York law does authorize such removals, Tenenbaum likely does not prohibit us from deferring to that judgment. In either case, the underlying New York procedural rules will also be an important component of our balancing. Thus, the state-law question of statutory interpretation will either render unnecessary, or at least substantially modify, the federal constitutional question.
 
 
 70
 b. Substantive Due Process
 
 
 71
 We think that the plaintiffs' substantive due process challenge to the ex parte removals does not present a "serious" constitutional question. In Tenenbaum, we held that brief removals generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal. 193 F.3d at 600-601 & n. 12. Similarly, in one of our earliest substantive due-process cases in this area, we found that there had been no such violation in the case of a temporary custody transfer, in part because it did "not result in [the] parents' wholesale relinquishment of their right to rear their children." Joyner ex rel. Lowry v. Dumpson, 712 F.2d 770, 778 (2d Cir.1983). As we have explained, the ex parte removal process is designed to safeguard the child until a court hearing is practicable, and judicial confirmation must be obtained "forthwith." N.Y. Fam. Ct. Act §§ 1022, 1026(c). Thus, we think it is plain under our precedents that the ex parte removals do not infringe on any of the plaintiffs' substantive due process rights.
 
 
 72
 c. Fourth Amendment
 
 
 73
 Turning to the Fourth Amendment claims raised by the subclass B plaintiffs, the argument could be made that the ex parte removals, if unauthorized under New York law, are unconstitutional. "[T]he Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation." Kia P. v. McIntyre, 235 F.3d 749, 762 (2d Cir.2000); see Tenenbaum, 193 F.3d at 601-02. As we observed in Tenenbaum, a warrantless arrest can usually be justified by the existence of probable cause to arrest arising at the time of the arresting officer's action. 193 F.3d at 603-04. By analogy, then, we could conclude that there is no Fourth Amendment violation committed by ACS officials carrying out an ex parte removal where there was probable cause to believe that there existed facts to merit emergency removal under New York law.
 
 
 74
 We have not addressed, however, the question whether in the context of the seizure of a child by a state protective agency the Fourth Amendment might impose any additional restrictions above and beyond those that apply to ordinary arrests. The Ninth Circuit, for example, has held that under a Fourth Amendment analysis, "[o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury." Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir.2000) (emphasis added). We left this question open in Tenenbaum. The basis for probable cause in Tenenbaum was that there was child abuse, 193 F.3d at 604, which in New York would necessarily entail at least a substantial risk of sexual abuse or physical injury to the child. See N.Y. Family Ct. Act § 1012(e). Therefore, we had no occasion to consider whether probable cause which arose as a result of other dangers — such as the theory of neglect advanced by ACS against the plaintiffs here — could be "reasonable" grounds for a seizure.
 
 
 75
 If, however, New York law does not authorize ex parte removals based on the danger that a child will witness domestic violence, we would not need to reach that question. That is, if the Court of Appeals were to hold that removals based only on exposing a child to domestic violence are unlawful, then presumably ACS would not have probable cause to remove in such circumstances.
 
 2. Court-Ordered Removals
 
 76
 Although the bulk of the parties' arguments have focused on ex parte removals, the district court's injunction also affects removals obtained or confirmed by order of the Family Court.[7] Again, though, a ruling from the Court of Appeals would obviate the need for us to consider the constitutionality of such removals.
 
 
 77
 a. Substantive Due Process
 
 
 78
 Removals in the circumstance where the parent permitted the child to witness domestic violence, but is otherwise blameless, presents a serious substantive due process question. We have offered many formulations of the test of substantive due process, not all of them entirely consistent with one another. For example, in determining the exactingness of our review, we have distinguished between challenges to government legislation or regulation and the "`specific act of a governmental officer.'" Leebaert v. Harrington, 332 F.3d 134, 139-40 & n. 2 (2d Cir.2003) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The allegations in this case are framed both as challenges to the individual discretionary acts of some officers as well as to the underlying official policies, so that it may not be clear what standard should apply. Because, however, we find serious constitutional questions regardless of the level of scrutiny with which we review the defendants' conduct, we will simply assume for purposes of our analysis that we would apply our most deferential review. Thus, we assume that we would uphold the government's actions where "case workers have a reasonable basis for their findings." Kia P., 235 F.3d at 758-59 (internal quotations and citations omitted); see Phifer v. City of New York, 289 F.3d 49, 60 (2d Cir.2002); Gottlieb, 84 F.3d at 518.
 
 
 79
 The question we are left with, then, is whether there is any evident "reasonable" justification offered by the City for removing the subclass B plaintiffs from their parents. We think it is clear that, where the parent's conduct increases the danger of violence directed against the child by the batterer, removal is "reasonable." In other cases, though, there is serious disagreement. Some of the New York lower courts have argued, in upholding removals of children from battered parents, that witnessing domestic violence is traumatic for the child, and perhaps causes later difficulties in learning and social interactions. See, e.g., In re Lonell J., 242 A.D.2d 58, 673 N.Y.S.2d 116, 117-18 (1998). But see Matter of Bryan L., 149 Misc.2d 899, 565 N.Y.S.2d 969, 972-73 (1991) (refusing to find fact that child witnessed domestic violence a basis for neglect in absence of expert testimony documenting harm to child). The Court of Appeals has agreed that an adult batterer can endanger the welfare of a child by abusing the child's mother. People v. Johnson, 95 N.Y.2d 368, 718 N.Y.S.2d 1, 740 N.E.2d 1075, 1077 & n.* (N.Y.2000). But the Court has not reached the issue as to whether removing a child from a battered mother serves the interests of the child.
 
 
 80
 The District Court heard testimony that removals may have the perverse effect of discouraging abused parents from taking action against their batterer. As Commissioner Scoppetta stated, "The plaintiffs in this case ... were saying [they] wouldn't report domestic violence again because [they are] afraid [ACS] would take [their] children away." Additionally, the District Court considered evidence that removing children from their parent is also a significant source of stress and emotional trauma, especially for young children. Other evidence suggested that removing children following episodes of domestic violence may actually intensify the trauma of the violence by removing the child's best coping mechanism, the parent, and encouraging feelings of self-blame. Moreover, both expert witnesses at trial and the academic literature argue that the harms children suffer from witnessing domestic violence are uncertain, and, according to some experts, relatively rare. See, e.g., Melissa A. Trepiccione, Note, At the Crossroads of Law and Social Science: Is Charging a Battered Mother with Failure to Protect Her Child an Acceptable Solution When Her Child Witnesses Domestic Violence?, 69 Fordham L. Rev. 1487, 1499-1506, 1517-18 (2001) (reviewing literature and criticizing various studies).
 
 
 81
 The challenge is how best to balance these difficult, competing considerations. On one hand, it could be argued that the exigencies of the moment that threaten the welfare of a child justify removal. On the other hand, a blanket presumption in favor of removal may not fairly capture the nuances of each family situation. We also note that plaintiffs and amici offer a variety of steps that a child welfare agency might take, short of removal, to mitigate the harms of domestic violence while avoiding the harms of separating the child from the battered parent. To be sure, few of these steps are foolproof; one witness argued that restraining orders can intensify conflict and lead to more dramatic episodes of violence. That determination, however, seems especially case-sensitive.
 
 
 82
 In our view, it would be much better, both from a standpoint of federalism and relative institutional expertise, if the New York courts had the last word on these questions. A definitive Court of Appeals decision one way or the other would obviate the need for us to reach what we believe is plainly a substantial constitutional question.
 
 
 83
 b. Procedural Due Process
 
 
 84
 The parents have, perhaps, a better procedural than substantive due process claim. Again, though, there is a antecedent question of New York law. The basic merits of the constitutional argument derive from what is sometimes referred to as the "irrebuttable presumption" cases. Most pertinently, in Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court upheld a father's challenge to an Illinois law conclusively presuming that, because he was not married to the mother of his children at the time of her death, he was not a suitable custodial parent for the children. Stanley raised an equal protection claim, id. at 646, 92 S.Ct. 1208, but the Court's decision rested instead on the Due Process Clause, id. at 650, 656-57, 92 S.Ct. 1208. The Court conducted a balancing test, analyzing Stanley's parental interest, id. at 651, 92 S.Ct. 1208, the state's interest in presuming Stanley was unfit, id. at 652-57, 92 S.Ct. 1208, and the likelihood that the presumption would produce errors, id. at 654-55, 92 S.Ct. 1208. Summing up, the Court said:
 
 
 85
 The State's interest in caring for Stanley's children is de minimis if Stanley is shown to be a fit father. It insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family.
 
 
 86
 Id. at 657-58, 92 S.Ct. 1208. In other words, the father has a procedural due process interest in an individualized determination of fitness.
 
 
 87
 The plaintiff parents here could well argue that New York law, as it has been applied, allows an insuperable presumption that simply because their child has witnessed domestic violence, the child has been harmed, and removal is therefore appropriate. New York lower courts have upheld removals based on the fact of battery alone, with no corresponding expert testimony on the appropriateness of removal in a particular instance. See, e.g., Matter of Carlos M., 293 A.D.2d 617, 741 N.Y.S.2d 82, 84 (2002); In re Lonell J., 673 N.Y.S.2d at 117-18. But see Matter of Bryan L., 565 N.Y.S.2d at 972-73.
 
 
 88
 On the other hand, it could be argued that the holding of Stanley and the procedure followed in the plaintiffs' cases are not inconsistent. New York does not "refus[e] a [parent] a hearing" before confirming a temporary removal. As noted above, the parents of a child removed without court order have the right to a hearing three days after an application, absent "good cause shown." N.Y. Fam. Ct. Act § 1028. Still, there might be some question whether a hearing that proves to be merely pro forma in light of the State's presumption would satisfy Stanley. Removal proceedings that fail to consider the individual circumstances of each family would be unlikely to reach accurate results in many cases.
 
 
 89
 Clearly, a decision of the Court of Appeals as to whether the statute includes merely viewing domestic violence, or if particularized evidence of harm to the child absent removal must be shown in a given case, would guide our inquiry.
 
 c. Fourth Amendment
 
 90
 Finally, there is a substantial Fourth Amendment question presented if New York law does not authorize removals in the circumstances alleged. We have said previously that a Family Court order is probably the equivalent of a warrant for Fourth Amendment purposes. Tenenbaum, 193 F.3d at 602. A warrant, of course, requires probable cause to support the seizure authorized by the warrant. Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 564, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). While we give considerable deference to the decisions of a "neutral magistrate" in issuing a warrant (or the Family Court equivalent), our review is not a "rubber stamp." United States v. Travisano, 724 F.2d 341, 345 (2d Cir.1983). Plainly, if New York law does not authorize the removals the plaintiffs complain of, there can be no probable cause to carry out the removal. State law, then, is potentially dispositive of this issue.
 
 Conclusion
 
 91
 Therefore, we are convinced that the Family Court Act is fairly susceptible to an interpretation by the New York Court of Appeals that would avoid or significantly alter the substantial constitutional questions presented in this appeal. While we think this would be reason enough to justify certification, we also note that there are other strong institutional considerations that weigh in favor of placing these challenging policy determinations at least initially in the hands of the New York Court of Appeals. Given the "detailed administrative scheme" New York has crafted to protect its children, in which the New York courts themselves play an integral part, "we hesitate to interfere in and potentially disrupt [the State's] well-considered process for investigating child abuse — an area in which the federal courts have little familiarity or expertise." Sealed v. Sealed, 332 F.3d 51, 59 (2d Cir. 2003).
 
 
 92
 For the foregoing reasons, we believe that the questions we certify are unsettled and that there exists a significant question of state law that may control the outcome of this appeal, see Second Circuit Local Rule § 0.27, as to which there is no clear controlling precedent of the New York Court of Appeals, see N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(a). For these reasons, resolution of the certified question by the New York Court of Appeals would aid in the administration of justice.
 
 
 93
 Accordingly, it is hereby Ordered that the Clerk of the Court transmit to the New York Court of Appeals a Certificate in the form attached, together with a complete set of the briefs (excepting those briefs filed by the State of New York and amici curiae Brennan Center for Justice and New York County Lawyers' Association), appendix and record filed by the parties with this court. This panel retains jurisdiction so that, after we receive a response from the New York Court of Appeals, we may dispose of the appeal.
 
 Certificate
 
 94
 Certificate to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(a).
 
 
 95
 1. Does the definition of a "neglected child" under N.Y. Family Ct. Act § 1012(f), (h) include instances in which the sole allegation of neglect is that the parent or other person legally responsible for the child's care allows the child to witness domestic abuse against the caretaker?
 
 
 96
 2. Can the injury or possible injury, if any, that results to a child who has witnessed domestic abuse against a parent or other caretaker constitute "danger" or "risk" to the child's "life or health," as those terms are defined in the N.Y. Family Ct. Act §§ 1022, 1024, 1026-1028?
 
 
 97
 3. Does the fact that the child witnessed such abuse suffice to demonstrate that "removal is necessary," N.Y. Family Ct. Act §§ 1022, 1024, 1027, or that "removal was in the child's best interests," N.Y. Family Ct. Act §§ 1028, 1052(b)(i)(A), or must the child protective agency offer additional, particularized evidence to justify removal?
 
 
 98
 The Court of Appeals, of course, may reformulate these questions as it deems necessary or appropriate. N.Y. Comp. Codes R. & Regs. tit. 22, § 500.17(a).
 
 
 
 Notes:
 
 
 [1]
 The District Court's Order also addressed important questions relating to the adequacy of New York's statutory scheme for appointing counsel to represent indigent parents in child protective proceedings. Because the counsel provisions were in part justified as a remedy for the putative constitutional questions we today avoid, we similarly defer consideration of the appointed counsel issues until, with the guidance of the New York Court of Appeals, we have a more complete sense of the state statutory framework
 
 
 [2]
 ACS can also refer cases to the District Attorney for investigation and possible criminal prosecution. N.Y. Soc. Serv. Law § 424(11)
 
 
 [3]
 The District Court attempted to, but could not, find a representative on behalf of a class of alleged batterer parentsNicholson v. Williams, 203 F.Supp.2d 153, 165 (E.D.N.Y. 2002).
 
 
 [4]
 We understand "neglected" in this context to exclude neglect based on a finding that the custodian allowed the child to witness domestic violence. The class definition itself notes that a prospective plaintiff is not excluded from the class "even if removal is ultimately approved by a court."In re Nicholson, 181 F.Supp.2d at 184. Thus, it is evident that the District Court did not intend for a Family Court finding of neglect, by itself, to foreclose class membership.
 
 
 [5]
 We do not understand the basis for the dissent's argument that there was insufficient evidence to support a finding of liability underMonell. See post at 177-179. The dissent's view appears to be that the only "policy" at issue in this case is the alleged "ACS policy to carry out removals based only upon past domestic violence and not based on a risk of ongoing harm to the child." Post at 177. As we have explained, however, the District Court's injunction was aimed not only at removals based strictly on past conduct, but also at removals justified by the possibility that future domestic violence would jeopardize the well-being of a child.
 It is true that the District Court's use of the phrase, "solely because the mother has been abused," taken out of context, may be ambiguous as to the two possibilities. The District Court's opinion makes clear, however, that the District Court did not believe it appropriate to charge the abused parent with blame for any emotional injury that child witnesses might suffer. See, e.g., Nicholson, 203 F.Supp.2d at 200-01, 252-53. Thus, when the District Court writes that removal is "solely because the mother has been abused," it is presuming that emotional harm to the child cannot be a basis for separating parent and child. While we do not consider the merits of that position now, it surely must inform our understanding of the policy actually considered by the District Court.
 Furthermore, it is evident from much of the District Court's discussion that it plainly contemplated the possibility of future instances of domestic violence in the challenged removals. For example, the District Court argued that among the reasons the removals are unconstitutional is the availability of alternative methods for preventing recurrences of domestic violence. Id. at 211. It also noted that ACS often failed to consider what the mother was doing to protect her child against further harm. Id. at 250. One of the purported failings in ACS's training procedures identified by the District Court was that ACS caseworkers are not taught to recognize cases where the threat of future instances of domestic violence in fact constitutes a sufficient danger to justify removal. Id. at 220.
 Therefore, it is largely irrelevant to our analysis whether there was sufficient evidence to establish an official policy or custom of removal based solely on past instances of neglect. The policy challenged by the plaintiffs and considered by the District Court was the alleged practice of removals based on a theory that allowing one's child to witness ongoing domestic violence is a form of neglect, either simply because such conduct is presumptively neglectful or because in individual circumstances it is shown to threaten the child's physical or emotional health.
 We also note our respectful disagreement with the dissent's view that the allegedly unconstitutional removals cannot be "widespread," simply because they represent a small percentage of the overall ACS caseload. See post at 178. We ask whether a practice is "widespread" in order to determine whether there is a fair inference that the "practice ... [is] so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco v. New York City Police Dep't, 971 F.2d 864, 871 (2d Cir.1992). We believe that the hundreds of incidents of unconstitutional conduct found by the District Court would certainly represent overwhelming evidence of the constructive acquiescence of senior officials, no matter how burdened such officials were with other matters.
 
 
 [6]
 We respectfully disagree with the suggestion of the dissent that the scope of the injunction in this case is so broad that it should be vacated irrespective of the extent of the constitutional violationsSee post at 181-184. We do not understand how we can assess the relation between right and remedy before we have determined what rights, if any, are affected by the alleged conduct. While we are sensitive to the concerns the dissent identifies, this court has recognized the need in some circumstances for judicial oversight of state institutions in order to assure compliance with federal norms. See, e.g., N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 706 F.2d 956, 960-64 (2d Cir.1983); Jose P. v. Ambach, 669 F.2d 865, 869 (2d Cir.1982); Todaro v. Ward, 565 F.2d 48, 53-54 (2d Cir.1977). We believe the plaintiffs are entitled to an opportunity to demonstrate that this case presents a need for appropriate judicial intervention, the merits of which we do not consider here.
 Nor do we believe, as the dissent further suggests, see post at 181, that a court can or should properly reach any conclusions about the likelihood of irreparable harm from the strategic decisions of plaintiff's counsel to delay seeking relief until such time as the plaintiffs can actually demonstrate that relief is warranted.
 
 
 [7]
 As we notedsupra, when ACS removes a child on its own initiative, the parent may move to have the child restored to her custody. The Family Court must then generally hold a hearing within three days, and "shall grant [the parent's] application, unless it finds that the return presents an imminent risk to the child's life or health." N.Y. Fam. Ct. Act § 1028(a). In those cases in which ACS does not initiate removal on its motion, it can bring an application before the Family Court for a "preliminary order" of removal, pending ACS's filing of a formal petition for removal, id. § 1022, or pending final disposition of the child's custody, id. § 1027. The standards the court must apply in determining whether or not to approve or continue preliminary removal are essentially the same in either case.
 
 
 
 99
 JOHN M. WALKER, Jr., Chief Judge, dissenting.
 
 
 100
 I dissent from the panel's decision to certify because I think the injunction should be vacated and nothing the New York Court of Appeals could decide would alter this outcome. While this case highlights some difficult questions of social policy that the Administration for Children's Services ("ACS") must resolve, it does not, in my view, present difficult questions of constitutional law. I would lift the preliminary injunction because the evidence cannot support the district court's findings underpinning the injunction: that ACS had a policy or practice that violated the Fourth and Fourteenth Amendments with respect to the removal of children from homes plagued by domestic violence.
 
 
 101
 The district court's central factual finding that ACS has a policy of "regularly separating battered mothers and children unnecessarily" is simply unsustainable. Nicholson v. Williams, 203 F.Supp.2d 153, 212 (E.D.N.Y.2002).
 
 
 102
 First, the district court claims that "[t]he consistent policy applied by ACS is to remove children of abused mothers ... solely because the mother has been abused." Id. at 250. By this, I take the district court to mean that it is ACS policy to carry out removals based only upon past domestic violence and not based on a risk of ongoing harm to the child. Absent a risk of future harm, of course, removing a child from its parents would violate both the Constitution and the Family Court Act. See Tenenbaum v. Williams, 193 F.3d 581, 594-95 (2d Cir.1999); In re H./R. Children, 302 A.D.2d 288, 756 N.Y.S.2d 166, 167 (1st Dep't 2003). But the evidence does not support a finding that ACS has such a policy.
 
 
 103
 In February 2001, seventeen months before the effective date of the district court's preliminary injunction, ACS promulgated revised "Principles For Addressing Domestic Violence in Children's Services" ("Principles"). Nicholson, 203 F.Supp.2d at 219. Under the Principles, the policy of ACS is clearly stated: It is to remove children only when "domestic violence creates an immediate danger of serious physical harm or serious emotional impairment to a child" and when "safety planning with the non-abusive parent and/or criminal justice intervention does not reasonably provide for children's safety." Evidence of ACS practice in the field fails to contradict this explicit policy statement.
 
 
 104
 Although four of the ten removals described by the representatives of subclass-A appear, in hindsight, to have been unnecessary, see id. at 168-70 (Sharwline Nicholson); id. at 177-79 (Ekaete Udoh); id. at 182-85 (Michele Garcia); id. at 185-86 (Michelle Norris), these cases demonstrate at most incorrect discretionary decisions by ACS caseworkers. They do not suffice to establish an agency policy or practice. To amount to an official policy or practice, the conduct must be "persistent and widespread" and "so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 870-71 (2d Cir.1992). Because ACS deals with between 53,000 and 58,000 cases each year, the handful of individual cases presented by plaintiffs cannot begin to demonstrate the breadth of occurrence that could sustain a finding of policy.
 
 
 105
 The district court also relied on statistical studies of ACS removals, see Nicholson, 203 F.Supp.2d at 208-09, but the statistics cut the other way. In every case where removal occurs, authority must be obtained from the Family Court, either in advance of or shortly after the removal (except in the case of a settlement). See N.Y. Family Ct. Act §§ 1022, 1024, 1026. A study by New York State shows that in 88.2 percent of cases involving domestic violence ACS did not seek to remove the child. Of the removals in 11.8 percent of the cases studied, other causes for removal existed in all but one case. Nothing in these studies precludes the possibility that the domestic violence was ongoing and, therefore, they cannot support the finding, or even likelihood, that ACS removes children when there is no risk of future harm. Finally, these removals are reviewed by the Family Court, which only permits removals where there is risk of future harm. See In re H./R. Children, 756 N.Y.S.2d at 167.
 
 
 106
 The second basis for the district court's conclusion that ACS removes children unnecessarily is that ACS ignores the reality that many removals could be avoided through better provision of services to battered mothers or through removal of the batterer. See Nicholson, 203 F.Supp.2d at 210-213. Again, the Principles are to the contrary.
 
 
 107
 The Principles state: "When domestic violence creates an immediate danger of serious physical harm or serious emotional impairment to a child, every effort should be made to provide for safety without separating the non-abusive parent and child." Id. at 219. In its factual determination of ACS policy, the district court discounted the foregoing statement in favor of ACS's general mission statement, which calls for caseworkers to resolve "[a]ny ambiguity regarding the safety of the child ... in favor of removing the child from harm's way." Id. at 218-19. The district court fails to explain adequately why an earlier, general mission statement is to be preferred over the subsequent, more detailed and relevant Principles For Addressing Domestic Violence. Surely the latter is the better indication of ACS's policy in this area. Moreover, the general mission statement embodies the understandable impulse toward prudence to ensure the safety of minors in the uncertain situation first encountered by the caseworkers; it does not contradict the Principles.
 
 
 108
 Plaintiffs offer no persuasive evidence that the Principles are not the true ACS policy. The district court points to two pilot projects undertaken by ACS, the Zone A and Zone C pilot projects, that resulted in fewer removals than occur normally. Id. at 206-07. However, the pilot projects' lower removal rates do not demonstrate that ACS policy is constitutionally deficient, only that improved management and greater care may result in fewer removals. Moreover, the very fact that ACS is engaged in such pilot projects is evidence that it recognizes that there may be instances where caseworkers effect unnecessary removals contrary to ACS policy and is taking steps to correct the problem.
 
 
 109
 The district court also points to the testimony of former Family Court Judge Phillip Segal that "[o]ften, ACS would remove the children as a first resort, rather than providing services." Id. at 214. But, such evidence is consistent with an effort on the part of caseworkers, unable to arrange services quickly enough to ensure the child's immediate safety, to secure the safety of the child first and then arrange for services once the child is safe, subject always to prompt review by the Family Court. The district court's reliance on the Domestic Violence and Child Maltreatment Project is similarly flawed. See id. at 215-16. The fact that in this project the Family Court almost always returned the children to the mother does not demonstrate that a caseworker was following a policy of unnecessary removal; it is fully consistent with success on the part of ACS and the Family Court in working out services or obtaining a restraining order that reduces the risk of harm.
 
 
 110
 To recap, the evidence in this case points in one direction. There is no ACS policy — formal, informal or sub rosa — to take children from their parents solely because the parent has been a victim of domestic violence. The most that can be said from the four instances presented at trial is that when such conduct occurs, it arises from a "a specific act of a governmental officer" making a decision in a particular case. County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Thus, to the extent that the injunction was based on the district court's factual finding that ACS removes children solely because the child has been exposed to domestic violence, it cannot stand.
 
 
 111
 The district judge also based the injunction on its view that it is wrong to even temporarily remove children from homes marred by domestic violence upon the justification that witnessing such violence would be harmful to the child. As a matter of policy preference, the issue is debatable. Compare plaintiffs' Subclass A expert Dr. Pelcovitz (noting "universal agreement that a certain percentage of children exposed to domestic violence suffer from a variety of behavior and emotional difficulties" and the need for "a relative cost benefit analysis" when deciding if a child should be removed) and Subclass B expert Professor McAllister (harm to children from witnessing domestic violence includes "both short-term symptoms" (sleep disturbance, separation anxiety, aggression or passivity/withdrawal, distractibility, hypervigilance), and longer-term problems (modeling behavior perpetuating relationship violence, "pervasive pessimism or sense of foreshortened future)") with plaintiff's expert Dr. Stark ("the vast majority of children ... who witness domestic violence, nevertheless test psychologically normal in most studies"). Indeed, the district court recognized "[t]he consensus of experts was that the children can be — but are not necessarily — negatively affected by witnessing domestic violence," Nicholson, 203 F.Supp.2d at 197; it sided, however, with Dr. Stark's "lengthy and well-substantiated opinion that children rarely experience long-term effects from witnessing domestic violence." Id. at 198.
 
 
 112
 While this policy preference may someday be manifest in the statutory and case-law of New York, it is not today. Family Court Act § 1012(f)(i)(B) states that a child is "neglected" and hence subject to the Act's removal process provisions when his "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent ... to exercise a minimum degree of care ... in providing the child with proper supervision or guardianship [or] by unreasonably inflicting ... a substantial risk thereof." New York courts readily hold a parent to this standard even though she herself may be the victim of domestic violence. See, e.g., In re Michael G., 300 A.D.2d 1144, 752 N.Y.S.2d 772, 772 (4th Dep't 2002) ("The exposure of the child to domestic violence between the parents may form the basis for a finding of neglect."); In re Nichole SS., 296 A.D.2d 618, 745 N.Y.S.2d 128, 129 (3d Dep't 2002) ("A child's exposure to domestic violence in the home standing alone may form the basis for a finding of neglect ...."); In re Carlos M., 293 A.D.2d 617, 741 N.Y.S.2d 82, 84 (2d Dep't 2002) ("Evidence of acts of severe violence between parents in the presence of their children is sufficient to show that the children's physical, mental, or emotional conditions are in imminent danger of becoming impaired within the meaning of Family Court Act § 1012(f)(i)(B)."); In re H./R. Children, 302 A.D.2d 288, 756 N.Y.S.2d 166, 167 (2003) (noting that a history of domestic violence, failure to take steps to prevent exposure to the domestic violence, and likelihood of continued exposure would demonstrate neglect).
 
 
 113
 The judicial function to be exercised in this case does not embrace taking sides in the policy debate over the efficacy of temporary child removal in domestic violence cases. The New York legislature has spoken and the Appellate Divisions of New York have uniformly upheld removals in such circumstances. The only question before this court is whether or not such removals violate the Constitution.
 
 
 114
 As the district court acknowledged, in Tenenbaum we held that an official's conduct in the course of removing a child must be "shocking, arbitrary and egregious" to violate substantive due process. 193 F.3d at 600; see also County of Sacramento, 523 U.S. at 846, 118 S.Ct. 1708. But the district court applied a different standard after concluding that Tenenbaum's test was too lenient to the government and was "motivated by an unwillingness to turn the Fourteenth Amendment into a catch-all cause of action in tort." Nicholson, 203 F.Supp.2d at 243. Instead, it determined that the appropriate test was that normally applied to challenges to the constitutionality of state statutes, as found in Joyner v. Dumpson, 712 F.2d 770 (2d Cir.1983), not challenges to discretionary executive judgments in individual cases.
 
 
 115
 Putting aside the question of whether the Joyner test is appropriate when the governmental action is attributable to the executive or an executive agency as opposed to the legislature, the test has no applicability in this case in which the government actions are individual and discretionary. In the typical situation, caseworkers, following an emergency referral, are confronted with a domestic violence scenario, often accompanied by indications of child neglect or drug and alcohol abuse. Acting under Family Court supervision, they perceive a risk to a child of either direct physical harm or psychological trauma and, in some cases (relatively infrequently, it turns out) decide to seek removal. Such conduct easily passes muster under either Tenenbaum and County of Sacramento's "shocks the conscience" test or, although it is unnecessary to so conclude, even under Joyner once one fairly evaluates what the government actors were doing here.
 
 
 116
 With respect to Tenenbaum, the idea that these temporary, discretionary child removals shock the judicial conscience — the correct test — is fully answered by the fact that such removals have not been found at all "shocking" to the judges of New York's Appellate Division who uniformly have upheld them. And if the applicable test were Joyner, I could not find the absence of a compelling state interest in such circumstances: The state interest in protecting children justifies infringing (generally temporarily) on a mother's interest in being with her child.
 
 
 117
 Relying on Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the district court also found that the procedures before the Family Court violate the battered mother's procedural Due Process rights by "presum[ing]" that the mother is unfit. Nicholson, 203 F.Supp.2d at 237. I disagree that this case involves an unconstitutional presumption similar to that described in Stanley. First, Stanley is simply inapposite because New York provides a judicial hearing for these child removals while in Stanley there was not even an administrative hearing at which a parent (the unmarried father in Stanley) could prove his fitness. Stanley, 405 U.S. at 646, 92 S.Ct. 1208. Second, because the evidence does not support a finding that ACS has a policy of removing children when there is no risk of future harm, there is no basis for a finding that removal is based on a presumption that battered mothers are neglectful parents simply by virtue of having been the victim of domestic violence. Third, I disagree with the majority's suggestion that, in the absence of specific expert testimony that the particular child is being harmed by witnessing domestic violence, a Family Court judge who orders a removal to protect the child from exposure to domestic violence may be unconstitutionally "presuming" that such harm has occurred or might occur.[1] See Maj. Op. supra at 174-176. When a Family Court judge, experienced in these matters, hears evidence of particular instances of domestic violence and then, taking into account the age of the child, determines that witnessing such violence could harm the child and warrants removal, the judge is making an individual decision based on evidence of violence in the home. Stanley is inapposite. That case involved a presumption based solely on an element of the father's status — the fact that he had not married his child's mother — that was only tangentially related to his relationship to his child. Cf. Stanley, 405 U.S. at 654, 92 S.Ct. 1208. In contrast, the inference made by the family judge in these cases, that the child may be at risk of harm, is based on the child's exposure to specific acts of domestic violence.
 
 
 118
 Finally, some observations about the preliminary injunction are in order. First, even if this case presented a likelihood of success on the merits, the preliminary injunction was not needed to prevent irreparable harm. Certainly the plaintiff classes took that position until fourteen months after the complaint in Nicholson was filed when, without a motion for a preliminary injunction having been made, the district court ordered on its own initiative that the parties should be prepared "to argue and present evidence ... on the question of whether a preliminary injunction should issue, and if so, on its contents." The court then tried the case sporadically over six months, issued the amended injunction in January 2002 and delayed its effective date to June 22, 2002 to see if the ACS would reform the procedures and practices that the court did not like.
 
 
 119
 Second, the sweeping preliminary injunction goes considerably beyond ordering remediation of the constitutional harm that the district court found to have occurred. As the Supreme Court pointed out in Lewis v. Casey, "the remedy must of course be limited to the [constitutional] inadequacy that produced the injury in fact that the plaintiff has established." 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); see also Missouri v. Jenkins, 515 U.S. 70, 89, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) ("The nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation.") (quoting Milliken v. Bradley, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). Accompanied by an opinion that fills sixty-eight pages of the Federal Supplement and reads like a management consultant's report, the injunction tells ACS not just to stop the perceived violation but in detail how it must reform itself to satisfy the district court. The injunction mandates how ACS can and cannot exercise its discretion in responding to domestic violence that threatens a child; requires that ACS distribute pamphlets to parents and children informing them of their rights before carrying out a removal; forces the ACS to change the way it reports the results of its investigations to the state; tells the ACS what the agency can and cannot plead in the Family Court; orders new case-planning conferences; directs the hiring of domestic violence specialists, establishes a Review Committee to oversee compliance with the court's order; and raises the compensation for appointed counsel. See In re Nicholson, 181 F.Supp.2d 182, 188-93 (E.D.N.Y.2001).
 
 
 120
 Wholly absent from the court's reasoning is respect for the principle that an injunction "must take into account the interests of state and local authorities in managing their own affairs." Milliken, 433 U.S. at 280-81, 97 S.Ct. 2749; see also Lewis, 518 U.S. at 362 & 363 n. 8, 116 S.Ct. 2174 (1996) (criticizing injunction as being "inordinately — indeed, wildly — intrusive" and for not "giv[ing] the States the first opportunity to correct the errors made in the internal administration of their prisons"); Jenkins, 515 U.S. at 102, 115 S.Ct. 2038 ("On remand, the District Court must bear in mind that its end purpose is not only `to remedy the violation' to the extent practicable, but also `to restore state and local authority to the control of a school system that is operating in compliance with the Constitution.'"); cf. Turner v. Safley, 482 U.S. 78, 92, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (noting that assessing the safety risk from inter-prison correspondence requires "a judgment `peculiarly within [prison official's] province and professional expertise'"). Rather, the injunction limits the City's capacity to manage ACS and improperly intrudes on the Family Courts' supervision of the ACS personnel who appear before it.
 
 
 121
 Such demanding and specific injunctions that go beyond ordering an agency to remediate violations of law and direct the agency on precisely how to do it frequently have unintended, counterproductive consequences that impair the administration of government agencies. See Ross Sandler & David Schoenbrod, Democracy by Decree 139-61 (2003) (describing the problems which arise when consent decrees lead to judicial management of administrative agencies). Even more importantly, such injunctions incur the cost of removing agency conduct from political accountability to democratically elected officials. It is those officials in a system of democratically elected government who are charged with meeting societal priorities and allocating budget and personnel. Id. The further risk is that by taking over policy functions that properly belong to elected officials or their political appointees, the courts themselves become political. As Professor Donald Horowitz explained in his study of courts and social policy a generation ago, "[t]he danger is that courts, in developing a capacity to improve on the work of other institutions, may become altogether too much like them." Donald L. Horowitz, The Courts and Social Policy 298 (1977).
 
 
 122
 One can envision that such intrusive intervention could become necessary to remedy constitutional wrongs in situations involving deliberate and flagrant violations of a court order by a state or municipal government bent on defying a constitutional mandate. Such interventions in the past were necessary to vindicate the equal protection rights of African-Americans in the wake of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and related statutory rights such as those under the Voting Rights Act of 1965. In some instances, they have been needed to remediate the depraved conditions in which prisoners have been kept. They have been justified when the defendant officials either do not care whether the command of law is followed or, worse, are committed to frustrating it. Cf. Inmates of D.C. Jail v. Jackson, 158 F.3d 1357, 1358-59 (D.C.Cir.1998) (noting that "[a]fter years of attempting to get D.C. to voluntarily comply, and appointing a Special Master to coordinate with D.C. in an attempt to alleviate conditions, the district court ordered that the jail's medical and mental health services be placed in receivership in 1995."). But ACS is not this sort of agency and, accordingly, this sort of remedial micromanagement is not warranted here. ACS, far from being a persistent law-breaker, is a creature of reform and appears committed to improvement.
 
 
 123
 ACS was created by Mayor Guiliani's executive order in January 1996 following the highly publicized torture and killing of six-year old Eliza Izquierdo by her mother after the abuse had been reported to the New York City's Child Welfare Agency. Defendant Nicholas Scopetta, the first Commissioner of ACS, developed a reform plan for the new agency, created a new management structure and sought input from hundreds of experts and specialists in child welfare.
 
 
 124
 Reforms followed. Professional standards for caseworkers and supervisors were raised through more rigorous job qualifications, enhanced training and incentives. Since 1996, ACS has hired over 1,500 new caseworkers and doubled the number of field managers employed in Child Protective Services. Training for new caseworkers was expanded from four weeks to ten months and was instituted agency-wide for supervisors and today includes an intensive six-day training course to update staff on investigative procedures. The result has been a highly trained staff and the reduction of caseworker caseload from approximately twenty-seven in June, 1996 to approximately twelve in March 2001. ACS has also implemented family conferences, usually not more than seventy-two hours after a child enters foster care. These conferences allow families and their support networks to discuss the case in a non-adversarial context and formulate a service or safety plan.
 
 
 125
 While the magnitude of the task (at least 53,000 cases per year) and the need for basic structural and managerial reform preoccupied the new agency in its early years, the agency also began to address domestic violence issues specifically. In brief summary, ACS has filled a new position of Domestic Violence coordinator created in 1996 with a person with strong ties to the advocacy community; followed its 1994 Zone C pilot (in which children were removed in four of the thirty-five cases in which domestic violence was identified) with a 1999 Zone A Pilot project (in which children were removed in six of the 197 cases in which domestic violence was identified (although another removal was found in a later review of 20 case records)); Commissioner Scopetta promulgated guiding ACS policy in the form of the Domestic Violence Principles in February 2001, characterized as "excellent" by Dr. Stark, the expert upon whom the district court placed primary reliance; and in January 2001, ACS established a separate office of Domestic Violence Policy and Planning and a month later convened a subcommittee on domestic violence screening and assessment procedures, including a Domestic Violence Protocol completed by caseworkers in each case involving domestic violence, to incorporate the contents and philosophy of the Principles. One result is that the Domestic Violence Protocol clearly states that "[t]he preferred way to enhance children's safety after the detection of domestic violence in their homes is to support and help the victim protect herself and her children, while engaging batterers in services and holding them accountable for their actions."
 
 
 126
 Add to the foregoing: the development of twelve Clinical Consultation teams from private providers comprised of specialists in domestic violence, substance abuse and mental health to advise on specific cases; two major initiatives to improve preventative service performance; considerable ongoing, specific training in domestic violence within the caseworker's core and ongoing training curriculum; and revisions to Family Court petitions to clarify that "engaging in domestic violence" should not be used "if the case history and evidence indicate that an individual has acted solely in self-defense."
 
 
 127
 This brief review of ACS initiatives and reforms should clarify that the district court was not faced with an agency resembling the Departments of Education of Alabama or Mississippi in the 1960s. Rather it indicates the appropriateness of deference to a municipal agency committed to reform and, despite the district court's conclusions to the contrary in its management review, seemingly quite capable of managing its responsibilities and dealing with the subtle and myriad complexities of policy choice within its demanding, politically charged environment.
 
 
 128
 The district court has no doubt uncovered important and difficult policy questions that ACS must grapple with: Under what circumstances should a child be removed, even temporarily, from a household plagued by domestic violence where the mother is not the instigator and where the effect on the child is that of witnessing domestic violence. But this question does not present a significant issue of constitutional import. Exposure to domestic violence poses enough risk of harm to a child that the Constitution does not bar a state from carrying out a removal to protect against that harm. Accordingly, I would immediately lift this ill-advised injunction and would not certify to the New York Court of Appeals because no decision by that court on the questions certified should alter this outcome.
 
 
 129
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 It is also not apparent from the record that ACS generally fails to provide testimony in Family Court regarding the risk of harm to the child