[60 NYS3d 472]

In the Matter of AMANDA CHAMBERS JOHNSON, Petitioner, v
MARGARET PALUMBO, Administrator of the City of Pough-
keepsie Office of Section 8 Housing, et al., Respondents.

Second Department, September 20, 2017

**APPEARANCES OF COUNSEL**

*Legal Services of the Hudson Valley*, Poughkeepsie (*Jared L. Gilman* and *Vinita Kamath* of counsel), for petitioner.

*McCabe & Mack LLP*, Poughkeepsie (*David L. Posner* and *Andrea L. Gellen* of counsel), for respondents.

**OPINION OF THE COURT**

BRATHWAITE NELSON, J.

The petitioner, Amanda Chambers Johnson, lived in an apartment in Poughkeepsie with her five children with the assistance of rent subsidy benefits under the Section 8 Housing Choice Voucher Program (*see* 42 USC § 1437f [b] [1]): On February 11, 2014, she was notified that her benefits under the program were being terminated due to alleged violations of the program rules. After an administrative hearing, the determination to terminate her benefits was confirmed based upon the finding that she was obligated, but failed, to request permis-

sion to add Antwone Jordan-McGill (hereinafter McGill) as an occupant to her subsidized apartment. We consider whether, under these circumstances, the petitioner was entitled to the housing protections of the Violence Against Women Act (hereinafter the VAWA; 42 USC § 13925 *et seq.*, transferred to 34 USC § 12291 *et seq.* [eff Sept. 1, 2017]) based upon uncontested hearing evidence establishing that she was subjected to an escalating pattern of stalking and abusive behavior and domestic violence by McGill, a former intimate partner, whose course of abusive and violent conduct against her included his unwanted presence in her apartment. For the reasons that follow, we conclude that she was entitled to the housing protections of the VAWA, which prohibited her termination from the program on this ground (*see* 42 USC § 14043e-11 [b] [2], now 34 USC § 12491 [b] [2]).

I. Factual and Procedural Background

The respondent City of Poughkeepsie Office of Section 8 Housing (hereinafter the agency) administers the federally funded Section 8 Housing Choice Voucher Program, which provides rent subsidies to low-income tenants (*see* 42 USC § 1437f). The petitioner had been a participant in the program for approximately 10 years and had resided with her children in Poughkeepsie at a particular apartment (hereinafter the contract unit) with the assistance of the program for approximately seven years. Through a "Notice of Termination" letter dated February 11, 2014, the agency notified the petitioner that it had decided to terminate her program assistance on the ground that she had violated the Housing and Urban Development (hereinafter HUD) Rules and Regulations. Specifically, the notice alleged that during the Section 8 recertification process on November 12, 2013, the petitioner had failed to fully disclose her household composition and all of the income attributable to her household, and had failed to request the agency's approval to add another family member as an occupant to the contract unit. It further alleged that the agency had learned that McGill had lived with the petitioner at the contract unit from June 2012 until December 2013, at which time he was arrested. It is undisputed that McGill remained incarcerated from the date of that arrest throughout these proceedings. The notice further advised the petitioner that if she did not agree with the decision to terminate her participation in the program, she had the right to request an "informal hearing" in accordance with 24 CFR 982.555 of the HUD rules and regulations. Federal regulations governing the

Housing Choice Voucher Program require that, prior to the termination of housing assistance payments under an outstanding housing assistance payments contract, the participant be given the opportunity for an informal hearing to determine whether the agency's decision to terminate assistance is in accordance with the law (*see* 24 CFR 982.555 [a]).

The petitioner requested such a hearing, which was held on March 19, 2014. In accordance with the governing rules and regulations, the agency and the petitioner were each given the opportunity to present evidence (*see* 24 CFR 982.555 [e] [5]), and the hearing officer allowed each to submit a written summation to assist with his determination. The agency presented the testimony of one of its housing program assistants and the testimony of a private investigator hired by the agency, as well as documentary evidence. The program assistant testified that his boss had received an anonymous phone call from a person reporting that someone was living at the contract unit with the petitioner. Although the program assistant did not know when that anonymous phone call was received, the investigator testified that McGill was already incarcerated on charges stemming from his December 2013 arrest when she received the matter to investigate. The investigator further testified that because McGill was incarcerated, she did not conduct any "investigation or personal surveillance" of the contract unit. Her investigation consisted solely of gathering documents by submitting Freedom of Information Law requests to various governmental agencies. Through this investigation, she obtained copies of, among other things, McGill's pay stubs, his driver's permit application, and records of his parole home visits by New York State Department of Corrections and Community Supervision parole officers, all of which listed the contract unit as McGill's address. The parole records also indicated that McGill's parole officer had some form of contact with McGill at the contract unit during some visits made between June 2012 and December 2013. In addition to these documents, the agency submitted a domestic incident report dated December 19, 2013, completed by a police officer, which reported an incident, described more fully by the petitioner in her testimony at the hearing, in which McGill pursued the petitioner to a police station parking lot, where he punched her twice in the face before being arrested. The domestic incident report indicated that the parties did not live together, but it also listed the contract unit as the address for both the

petitioner and McGill. Based on this documentary evidence establishing that McGill had used the contract unit as his address, the agency asserted that McGill was residing at the contract unit and the petitioner's housing assistance benefits were properly terminated because she failed to request agency approval to add him as an additional occupant to the unit and disclose his income during the recertification process, despite signing documents on November 12, 2013, which contained the relevant rules obligating her to do so.

The petitioner testified at the hearing and submitted a number of documents. She took the position that McGill did not live with her at the contract unit and that the evidence submitted by the agency indicating that McGill was residing there existed as a result of domestic violence and stalking. In her testimony, the petitioner described an escalating pattern of stalking and abusive behavior and domestic violence by McGill that culminated in the December 2013 incident leading to his arrest. The petitioner testified as follows. In June 2012, she permitted McGill, who was then a friend, to use the contract unit address for purposes of registering for parole; however, this was meant to be temporary and at no point did he actually live in the contract unit. In about July 2012, she and McGill entered into an intimate relationship, she "immediately" became pregnant, and McGill began to act controlling and domineering, eventually starting to threaten, intimidate, and harass her. He wanted the petitioner to have an abortion and threatened to "give [her] an abortion, if [she] wouldn't go and get one." McGill "just went from one person to a totally different person." At first, the petitioner told him to leave her alone, that she did not "believe in abortion," and he would not need to be part of the baby's life. After that, McGill "became terrifying." He started asking the petitioner for keys to her apartment. She told him "no," but, against her wishes, McGill took a spare set of keys, which the petitioner had kept for her children. McGill would disappear for periods of time and then suddenly reappear. He began entering the petitioner's home at will, "whenever he felt like it," and told her that he would never give her back her keys.

McGill began to call the petitioner "over, and over, and over," 30 to 40 times in succession, until she would answer the phone, including times when she was at work. If the petitioner did not answer when McGill called, he would either find her or wait for her at her home and smash her cell phone. He smashed her

cell phone on four occasions between October 2012 and June 2013. The petitioner became "truly terrified" of McGill, who often would "go at [her]," spit in her face, scream at her, and threaten her.

The petitioner testified that beyond the day he asked to use her address, McGill did not ask her permission for anything. The petitioner was not aware that McGill had used the contract unit address with his employer. His pay stubs did not come to her apartment. Nor was she aware that he had used the contract unit address when he applied for a driver's permit. She became aware of this fact when the permit was delivered to her apartment. She gave the permit to McGill and did not question him about it because she was scared of him. The petitioner maintained that from the time period of June 2012 through December 2013, although McGill used the keys he took to enter her apartment 48 to 100 times, he stayed overnight in her apartment at most 20 times. At the time, he told her that he was living with his brother, but since his incarceration in December 2013, the petitioner heard that he had been living with other women. The petitioner explained how she would contact McGill when his parole officer came to her apartment to conduct a home visit. If the visit was unannounced, she would rush to call McGill before the parole officer did because if McGill did not hear from the petitioner first, he would say that she was "trying to set him up." He would threaten, "You're gonna dig yourself a hole, and nobody's gonna find you." According to the petitioner, McGill would "just go off" if he heard something he did not like. As a result, she tried to "play nice," and did not confront him regarding his continued use of her address with his parole officer, his unauthorized access to her home, or his unauthorized use of her address on his driver's permit. The petitioner testified that McGill was "just a very wicked individual and [she] truly could not have done anything different than what [she] did to survive." When pressed on cross-examination to explain why she did not seek an order of protection prior to December 2013 or try to stop McGill from accessing her apartment sooner, the petitioner replied,

> "I know it's hard to understand. You never think that someone will control you . . . But when you are in that situation, it's a totally different world . . . When you are scared of somebody and you have five kids to take care of, to get ready for

school, to got to work, to put on a smile every single day, it changes the dynamic of things that become important."

The petitioner felt that McGill's use of her address and the taking of her keys was a means for him to control, abuse, and manipulate her.

McGill's threats escalated into physical violence on December 19, 2013, when the incident resulting in his arrest occurred. The petitioner testified that she decided to get her keys back from McGill that day because her son was turning 15, and she realized that she "just could not do it anymore, being scared all the time" and having her children witness McGill's abusive and domineering behavior toward her. The petitioner and her cousin drove, in the petitioner's vehicle, to McGill's workplace at the time of his lunch break. The petitioner falsely told McGill that she could not find her keys, that representatives from the agency were at the contract unit, and that she needed to get the spare set of keys from him so that she could let them into the apartment to conduct an inspection. McGill handed her the keys, but she was shaking. The petitioner turned to walk away, and McGill said, "Wait a minute . . . What are you doing?" The petitioner got into her vehicle and her cousin started to drive away. McGill got into his vehicle and pursued. He called the petitioner on her cell phone and told her to pull over. The petitioner refused and said, "I just can't take it anymore. I can't live like this anymore. Just leave me alone." McGill sped up and repeatedly told the petitioner to "pull over. I've got something for you." He tried to cut off the petitioner's vehicle, but the petitioner's cousin was able to drive to a police station. At the police station, the petitioner exited her vehicle. McGill exited his vehicle, approached the petitioner, and accused her of having "tricked him." Before the petitioner could respond, McGill punched her in the face, chipping her tooth. He punched her again in the face before police officers intervened and arrested McGill. In addition to the above testimony, the petitioner submitted into evidence police department domestic incident reports, criminal complaints, a Criminal Court order of protection, a family offense petition, and a Family Court order of protection. These documents pertained to the December 19, 2013 incident, as well as subsequent violations of the orders of protection. Asked why the domestic incident report listed McGill's address as being at the contract unit, the petitioner testified that the police used the address listed on McGill's driver's permit.

After the hearing, both the agency and petitioner submitted written summations to the hearing officer. In its summation, the agency affirmatively argued that it had not terminated the petitioner's housing benefits in violation of the VAWA because at the time the petitioner's benefits were terminated, it was aware only of the December 2013 incident of domestic violence, and its allegation of unauthorized occupancy stemmed from McGill's occupancy from June 2012 to December 2012. The agency also cited the petitioner's failure to report, prior to the hearing, that she was a victim of domestic violence as a basis for rejecting her testimony, and denying her the protection of the statute. In her written summation, the petitioner contended that she was entitled to the protection of the VAWA because, to the extent that McGill lived in the contract unit, he did so because she feared him and was "scared of what would happen if she changed the status quo."

In a decision dated March 25, 2014, the hearing officer confirmed the agency's termination of the petitioner's participation in the Section 8 Housing Choice Voucher Program. The hearing officer found undisputed the facts that McGill had used the contract address for the purposes of satisfying a condition of his parole, to obtain a driver's permit, and for employment purposes, and that McGill assaulted the petitioner on December 19, 2013, and had since been incarcerated. Based on the parole records, which indicated that a parole officer had contact with McGill at the contract unit during certain early morning and late evening visits, the hearing officer rejected the petitioner's testimony that McGill did not reside at the contract unit, and found that McGill had resided with the petitioner "at least for some period." He therefore found, by a preponderance of the evidence, that the petitioner had failed to request permission to add a family member as required by the HUD rules and regulations. The hearing officer stated that the petitioner bore the burden of proving "first, that she was a victim of domestic violence and second, that her actions were as a result of or related to that violence." Although he did not discredit the petitioner's testimony of the nature of her relationship with McGill and how McGill came to possess keys to the contract unit and use it as his address, the hearing officer nonetheless concluded that there was no evidence of violence or fear in June of 2012, and even were there evidence of violence that early, he "fail[ed] to see how that fear would excuse the [petitioner from] requesting to add another family

member." Consequently, the hearing officer found no basis to apply the VAWA in this case.

The petitioner thereafter commenced this CPLR article 78 proceeding in the Supreme Court seeking review of the determination, arguing, among other things, that the hearing officer erred as a matter of law in concluding that the VAWA did not prevent her tenancy from being terminated. In an order entered October 1, 2014, the Supreme Court transferred the proceeding to this Court upon finding that one of the issues raised in the petition was whether the determination was supported by substantial evidence (*see* CPLR 7804 [g]).

II. Discussion

Originally enacted in 1994, one of the VAWA's purposes was to provide greater protections to victims of domestic violence (*see* Violent Crime Control and Law Enforcement Act of 1994, Pub L 103-322, tit IV, 108 US Stat 1796). In 2005, it was reauthorized and expanded to include, among other things, protection for victims of domestic violence who receive publicly assisted housing benefits, including participants of the Section 8 Housing Choice Voucher Program (*see* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub L 109-162, tit VI, 119 US Stat 2960; 42 USC § 14043e *et seq.*, now 34 USC § 12471 *et seq.*). In expanding the VAWA to encompass certain public housing programs, Congress acknowledged that "[t]here is a strong link between domestic violence and homelessness," and "[w]omen and families across the country are being discriminated against, denied access to, and even evicted from public and subsidized housing because of their status as victims of domestic violence" (42 USC § 14043e [1], [3], now 34 USC § 12471 [1], [3]). Domestic violence has caused shelter populations to increase because of the scarcity of housing (*see* Mireya Navarro, *Homeless, Because They Are Abused at Home*, NY Times, Nov. 11, 2014, § A at 1, col 0). The purpose of the VAWA, as applied to public housing, is to reduce domestic violence and stalking, among other things, and to prevent homelessness (*see* 42 USC § 14043e-1, now 34 USC § 12472). To that end, the VAWA provides that, in general,

> "An applicant for or tenant of housing assisted under a covered housing program may not be denied admission to, denied assistance under, terminated from participation in, or evicted from the housing on the basis that the applicant or tenant is or has been a victim of domestic violence,

dating violence, sexual assault, or stalking, if the applicant or tenant otherwise qualifies for admission, assistance, participation, or occupancy" (42 USC § 14043e-11 [b] [1], now 34 USC § 12491 [b] [1]).

As relevant here, the VAWA specifically provides that an incident of actual or threatened domestic violence, dating violence, sexual assault, or stalking, shall not be construed as a serious or repeated lease violation, or good cause for terminating assistance to the victim (*see* 42 USC § 14043e-11 [b] [2] [A], [B], now 34 USC § 12491 [b] [2] [A], [B]).

Notwithstanding the above, even if a tenant has established that he or she is a victim under the VAWA, a public housing authority may terminate assistance on other independent grounds. In that regard, the VAWA does not limit the ability of a public housing authority to terminate assistance for a lease violation unrelated to domestic violence, dating violence, or stalking, provided that the public housing authority does not subject an individual who has been the victim of such violence to a more demanding standard than other tenants (*see* 42 USC § 14043e-11 [b] [3] [C] [ii], now 34 USC § 12491 [b] [3] [C] [ii]; *see also* 24 CFR 5.2005 [d] [2]* ).

■ Here, the hearing officer upheld the termination of the petitioner's participation in the Housing Choice Voucher Program on the ground that McGill resided with the petitioner, therefore she was obligated to request permission to add him as an occupant of the unit, and her failure to request such approval was a violation of her obligations under the program warranting termination of her participation in the program. The regulations governing the Section 8 Housing Choice Voucher Program authorize, but do not require, a public housing agency to terminate program assistance for a participant if the participant violates any obligations under the program (*see* 24 CFR 982.552 [c] [2] [i]). The petitioner's obligations under the program included the duty to request the agency's written approval to add any other family member to the contract unit. The petitioner signed a form on November 12, 2013, acknowledging that violating this obligation was grounds for termina-

---

* We note that some of the relevant HUD regulations were amended in November 2016 in a manner that affected the internal numeration of some of the regulations cited to herein. Because the amendments did not affect the substance of the regulations insofar as they relate to this proceeding, we cite to the current version of the regulations.

tion of her housing assistance. We note that although the hearing officer suggested in his determination that the petitioner was obligated to seek the subject approval as early as June 2012, the agency's notice of termination identified the November 12, 2013 recertification process and the documents that the petitioner signed at that time as the basis of the petitioner's alleged violation. Consequently, it is the petitioner's failure to seek approval to add McGill as an occupant at that point in time that is at issue (*see generally* 24 CFR 982.555 [e] [2]). In this proceeding pursuant to CPLR article 78, we accept, as we must, the hearing officer's factual determination that McGill resided with the petitioner "at least for some period" (*see Matter of Berenhaus v Ward*, 70 NY2d 436, 443 [1987]; *Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 230 [1974]). However, we find that the hearing officer erred in his legal conclusion that the petitioner was not entitled to the protections of the VAWA.

As noted above, the VAWA provides that incidents of actual or threatened domestic violence or stalking shall not be construed as good cause for terminating assistance under a covered housing program (see 42 USC § 14043e-11 [b] [2] [B], now 34 USC § 12491 [b] [2] [B]). The VAWA defines "domestic violence" as felony or misdemeanor crimes of violence committed by, among others, a current or former intimate partner of the victim, a person with whom the victim shares a child in common, or a person who is cohabiting with or has cohabitated with the victim as an intimate partner (*see* 42 USC § 13925 [a] [8], now 34 USC § 12291 [a] [8]; *see also* 24 CFR 5.2003). It defines "stalking" to mean engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for her safety or the safety of others, or suffer substantial emotional distress (*see* 42 USC § 13925 [a] [30], now 34 USC § 12291 [a] [30]; *see also* 24 CFR 5.2003).

The petitioner's testimony established that throughout her relationship with McGill, which spanned from July 2012 through December 2013, McGill threatened, intimidated, harassed, and physically assaulted her. This unrefuted testimony established incidents of domestic violence and a course of conduct by McGill directed at the petitioner that would cause a reasonable person to fear for her safety or suffer substantial emotional distress. Moreover, his presence at her home and continued access to the contract unit was an integral part of

the intimidation. There was no evidence presented at the hearing from which the hearing officer could conclude that the petitioner voluntarily gave McGill permission to reside at the contract unit from June 2012 through December 2013, or that his ultimate residency there "for some period of time" was unrelated to the domestic violence he perpetrated upon her (*cf. Hammond v Akron Metro. Hous. Auth.*, 2011-Ohio-2635, 2011 WL 2175801, 2011 Ohio App LEXIS 2241 [Ct App 2011]). Indeed, the hearing officer did not make such findings. Instead, he concluded that any fear experienced by the petitioner did not excuse her from requesting to add McGill as an occupant of the contract unit. This conclusion reflects a misinterpretation of the statute. The VAWA seeks to provide greater protections to victims of violence and intimidation perpetrated by an intimate partner. Here, in light of the uncontested evidence that McGill's presence in and access to the contract unit was the result of conduct that constitutes domestic violence and stalking as defined by the VAWA, it would be unreasonable and inconsistent with the purpose of the statute to require the petitioner to seek permission to add McGill as an occupant of the unit. Indeed, requiring the petitioner to do so would effectively require her to legitimize his access to the contract unit by making him an established part of her household, thus giving him greater power and control over her. The hearing officer's failure to recognize that McGill's presence in and access to the contract unit was the result of domestic violence did not take into account the dynamics of domestic violence where the victim very often fails to report the abuser to the police, medical professionals when being treated for injuries inflicted by a batterer, or even to her family (*see Nicholson v Williams*, 203 F Supp 2d 153 [ED NY 2002], *affd in part sub nom. Nicholson v Scoppetta*, 344 F3d 154 [2d Cir 2003]). To uphold a conclusion that the petitioner violated her obligation under the Section 8 Housing Choice Voucher Program by failing to seek permission to add McGill as an occupant would place her in the untenable position of having to either choose between becoming more deeply embroiled in an abusive situation by legitimizing his presence in the contract unit, or facing the loss of the housing assistance benefits she relies upon for herself and her five children. This is a choice that a domestic violence victim should not have to make (*see Nicholson v Williams*, 203 F Supp 2d 153 [2002], *affd in part sub nom. Nicholson v Scoppetta*, 344 F3d 154 [2003]; *see also Nicholson v Scoppetta*, 3 NY3d 357 [2004]),

and we decline to read the VAWA in such a way, which is plainly inconsistent with its salutary purposes (*see generally* 42 USC § 14043e-1, now 34 USC 12472).

■ ■ We also reject the agency's contention that the petitioner is not entitled to the protection of the VAWA because she did not report that she was a victim of domestic violence prior to the informal hearing, and did not provide third-party documentation to corroborate her testimony. As to the timeliness of the petitioner's assertion, no statutory or regulatory provisions dictate when and how a tenant must assert her right to protections under the VAWA (*cf.* 42 USC § 14043e-11, now 34 USC § 12491; 24 CFR 5.2005). Furthermore, the petitioner had no cause to assert the protections of the VAWA until she received the notice of termination from the agency, which directed her to request an informal hearing if she disagreed with the decision to terminate her participation in the program. As to the petitioner's burden of proof, the VAWA places no burden of proof in the first instance on a person seeking the protections of the VAWA. If a tenant of covered housing represents that she is "entitled to protection under [the VAWA]" (42 USC § 14043e-11 [c] [1], now 34 USC § 12491 [c] [1]), documentation is not required (*see* 42 USC § 14043e-11 [c] [5], now 34 USC § 12491 [c] [5]; *see also* 24 CFR 5.2007 [b] [3]). Nonetheless, the public housing agency may, in its discretion, request that the tenant submit a form of documentation described in the statute (*see* 42 USC § 14043e-11 [c] [1], now 34 USC § 12491 [c] [1]; *see also* 24 CFR 5.2007 [a] [1]). However, it cannot deny relief for protection under the VAWA unless it has provided the individual with a written request for such documentation and the individual has failed to provide documentation within the specified time (*see* 42 USC § 14043e-11 [c] [1], [2], now 34 USC § 12491 [c] [1], [2]; *see also* 24 CFR 5.2007 [a]). Here, the agency never made a written request for documentation which would have prompted the petitioner's obligation to provide such documentation (*see* 42 USC § 14043e-11 [c] [2], now 34 USC § 12491 [c] [2]; *see also* 24 CFR 5.2007 [a] [2]).

In any event, the petitioner's testimony at the informal hearing was sufficient to establish that she was entitled to the protections of the VAWA (*see* 42 USC § 14043e-11, now 34 USC § 12491). Where the public housing agency has made a written request for documentation, the tenant may submit any one of the specified forms of documentation "at the discretion of the

tenant" (24 CFR 5.2007 [b] [1]; *see* 42 USC § 14043e-11 [c], now 34 USC § 12491 [c]). The choices include a HUD-approved certification form, which may be based solely on the personal signed attestation of the victim (*see* 42 USC § 14043e-11 [c] [3] [A], now 34 USC § 12491 [c] [3] [A]; 24 CFR 5.2007 [b] [1] [i]), and, at the discretion of the housing agency, "a statement or other evidence provided by an applicant or tenant" (42 USC § 14043e-11 [c] [3] [D], now 34 USC § 12491 [c] [3] [D]; *see* 24 CFR 5.2007 [b] [1] [iv]). "[A]s long as the victim provides a HUD-approved certification form, third-party documentation, a verbal statement, or other corroborating evidence, the victim is statutorily entitled to [the] protections [of the VAWA]" (HUD Programs: Violence Against Women Act Conforming Amendments, 75 Fed Reg 66246-01, 66251 [2010]). Here, because the agency never made a written request for documentation, there was no occasion for the petitioner to respond accordingly. The question of the VAWA's application arose in the nature of the informal hearing where the petitioner testified as detailed above, under oath. Moreover, her sworn hearing testimony, which provided far more detail than called for by the HUD-approved certification form, was sufficient to document the occurrences of domestic violence and stalking perpetrated against her by McGill (*cf.* 24 CFR 5.2007), and established that she was statutorily entitled to the protections of the VAWA. Contrary to the agency's contention, no third-party documentation of the petitioner's account was necessary.

Finally, although not determinative of the legal issue before us, we note that under the HUD rules and regulations, "[c]overed housing providers are encouraged to undertake whatever actions permissible and feasible under their respective programs to assist individuals residing in their units who are victims of domestic violence, dating violence, sexual assault, or stalking to remain in their units or other units under the covered housing program" (24 CFR 5.2009 [c]). Here, the agency's investigation, which was prompted by an unidentified anonymous caller, did not commence until after the December 19, 2013 assault resulting in McGill's arrest. By the time the agency decided to terminate the petitioner's participation in the program, McGill had been incarcerated for nearly two months for assaulting the petitioner, and plainly was no longer living in the contract unit. McGill's continuing acts of harassment, intimidation, and domestic violence against the petitioner were well documented before the agency. Under the cir-

cumstances, the agency's determination to exercise its discretion in a way that would result in the petitioner's loss of her unit was inconsistent with the VAWA.

In sum, we find that the hearing officer's determination was affected by an error of law and rendered in violation of the VAWA (*see* 42 USC § 14043e-11 [b] [1], [2], now 34 USC § 12491 [b] [1], [2]; CPLR 7803 [3]). The petitioner's alleged violation of the program rules was her failure to seek agency approval to add McGill as an occupant to the contract unit. However, the unrefuted evidence at the informal hearing established that McGill's residency at the contract unit was a result of the intimidation, harassment, and domestic violence that he carried out against the petitioner. The petitioner did not willingly allow McGill's very limited residency in her apartment. Adding McGill as an occupant to the contract unit would have increased McGill's control over the petitioner and furthered the fear-inducing course of conduct which he had directed at her. On the record presented, we are persuaded that the termination of the petitioner's participation in the program and McGill's abusive and violent conduct against the petitioner are inextricably intertwined. Under these circumstances, we hold, as a matter of law, that the petitioner was entitled to the housing protections of the VAWA, which prohibited the agency from terminating her participation in the program on this ground.

In light of our determination, we need not reach the petitioner's remaining contentions, including the substantial evidence issue.

Accordingly, the petition is granted, the determination is annulled, and the matter is remitted to the respondents to reinstate the petitioner's participation in the Section 8 Housing Choice Voucher Program retroactive to March 25, 2014.

LEVENTHAL, J.P., MALTESE and LASALLE, JJ., concur.

Adjudged that the petition is granted, on the law, without costs or disbursements, the determination is annulled, and the matter is remitted to the respondents to reinstate the petitioner's participation in the Section 8 Housing Choice Voucher Program retroactive to March 25, 2014.